413 S.E.2d 897

**Julian GARNES and Sharon Garnes, Plaintiffs Below, Appellees,**

v.

**FLEMING LANDFILL, INC. and John T. Fleming, Defendants Below, Appellants.**

**No. 20284.**

Supreme Court of Appeals of West Virginia.

Submitted Oct. 1, 1991.

Decided Dec. 5, 1991.

Rehearing Denied Feb. 13, 1992.

Arden J. Curry, Arden J. Curry, II, David K. Schwirian, Pauley, Curry, Sturgeon & Vanderford, Charleston, for appellants.

Benjamin N. Snyder, Clendenin, for appellees.

NEELY, Justice:

Julian Garnes and Sharon Garnes brought an action against Fleming Landfill and John T. Fleming in the Circuit Court of Kanawha County alleging that Mr. Fleming's operation of a solid waste disposal facility constituted a nuisance. A jury awarded the Garnes $105,000 in punitive damages, but no compensatory damages. After the circuit court denied Mr. Fleming's motions for judgment notwithstanding the verdict, a new trial, and remittitur, Mr. Fleming petitioned this Court for an appeal. Among other assignments of error, Mr. Fleming alleged that the award of punitive damages in this case violated due process of law. On 10 January 1991, this Court denied the petition. Mr. Fleming then filed a petition for a writ of certiorari in the U.S. Supreme Court and the U.S. Supreme Court remanded the case to us for reconsideration in light of its opinion in *Pacific Mutual Life Ins. Co. v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). We reverse based on *Haslip*.

I.

In 1978, Mr. Fleming opened a landfill on Mundy Hollow Road in Kanawha County, near the house of Mr. and Mrs. Garnes. Both plaintiffs and defendants offered numerous witnesses who testified about the problems (or lack thereof) caused by the landfill. The jury awarded Mr. and Mrs. Garnes no compensatory damages, but $105,000 in punitive damages.[1]

1. The jury instructions included the following: Plaintiffs' Instruction No. IV: If you find that defendants caused a nuisance ... you may find for the plaintiffs and you may award them such sums of money as you conclude from the evidence will fairly compensate them for the loss of beneficial uses and quiet enjoyment of their property, if any, and the diminution in the value of their property, if any, which you believe resulted from the activities of the defendants.

## II.

### A.

Courts have long awarded punitive damages in tort cases. For just as long, commentators have questioned the justice of punitive damages. Notwithstanding commentators' questions, punitive damages have stood the test of time. Professor Sedgwick traces punitive damages to the earliest days of civil jury trials. He says that when courts developed a rule for punitive (or exemplary) damages "nothing was further from the mind of the judges than that they were establishing a new doctrine; they founded the decision entirely on existing precedent." T. Sedgwick, *A Treatise on the Measure of Damages*, § 350 (9th ed. 1913). The doctrine has existed since the earliest days in American jurisdictions. *Id.* at § 351.

The U.S. Supreme Court has approved punitive damages on numerous occasions. In *Day v. Woodworth*, 13 How. 363, 14 L.Ed. 181 (1852), the Court said:

We are aware that the propriety of this doctrine has been questioned by some writers; but if repeated judicial decisions for more than a century are to be received as the best exposition of what the law is, the question will not admit of argument. By the common as well as by statute law, men are often punished for aggravated misconduct or lawless acts, by means of a civil action, and the damages, inflicted by way of penalty or punishment, given to the party injured.

*See also Missouri Pacific R. Co. v. Humes,* 115 U.S. 512, 6 S.Ct. 110, 29 L.Ed. 463 (1885); *Barry v. Edmunds,* 116 U.S. 550, 6 S.Ct. 501, 29 L.Ed. 729 (1886); *Minneapolis and St. Louis R. Co. v. Beckwith,* 129 U.S. 26, 9 S.Ct. 207, 32 L.Ed. 585 (1889); and *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). In fact, the U.S. Supreme Court has overseen the *expansion* of punitive damages. *See, e.g., Smith v.*

*Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (affirming the assessment of punitive damages under 42 U.S.C. § 1983, and the use of the common law method to determine the amount of the award.)

Recent newspaper headlines and law review articles about the record size of punitive damages awards suggest that something is changing. Juries are awarding punitive damages more frequently and in larger amounts. *See* M. Wheeler, "A Proposal For Further Common Law Development of the Use of Punitive Damages in Modern Product Liability Litigation," 40 *Ala.L.Rev.* 919 (1989). However, this is not a completely new phenomenon; commentators have decried the problem of large and unpredictable punitive damages awards for years. *See, e.g.,* C. Morris, "Punitive Damages in Tort Cases," 44 *Harv.L.Rev.* 1173 (1931). The U.S. Supreme Court addressed punitive damages awards in *Browning–Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) and held that punitive damages awards in civil cases between private parties could not violate the excessive fines clause of the Eighth Amendment; however, the Court expressly reserved judgment on the due process challenge to punitive damages awards. In *Haslip,* the Court finally held that punitive damages awards *could* violate due process in some cases, and the Court attempted to establish criteria for determining whether a particular punitive damages award is outside legitimate due process boundaries.

### B.

Although law and economics is a "new" trend in law schools, commentators have long recognized the "law and economics" effect of punitive damages. In 1931, Professor Morris noted that damages generally are reparative and admonitory. Morris, *supra,* at 1177. Punitive damages are nec-

---

Plaintiffs' Instruction No. V: In addition to any sum of money awarded to the plaintiffs because of the diminution of value to their property, if you find for the plaintiffs you

may award them such additional sums of money for their annoyance, discomfort, and inconvenience, if any, caused by the activities of the defendants.

essary when compensatory damages are not large enough to convince a defendant or future defendants to take precautions against similar problems. For instance, a man wildly fires a gun into a crowd. By sheer chance, no one is injured and the only damage is to a $10 pair of glasses. A jury reasonably could find only $10 in compensatory damages, but thousands of dollars in punitive damages to teach a duty of care. We would allow a jury to impose substantial punitive damages in order to discourage future bad acts. Morris, *supra*, at 1181.

This deterrence theory has spread far beyond our irresponsible gunman and is now most prevalent in products liability cases. A court in California determined that when the Ford Motor Company chose not to replace or repair gas tanks in its Pinto automobiles, Ford knew the tanks were dangerously defective. The jury believed that Ford chose not to redesign the dangerous tanks because the costs of fighting (and even losing) lawsuits when a few people died was cheaper than recalling defective vehicles, and it awarded $125 million in punitive damages in order to discourage Ford (and General Motors, Chrysler, et al.) from making such irresponsible decisions in the future. *Grimshaw v. Ford Motor Company*, 119 Cal.App.3d 757, 174 Cal.Rptr. 348 (1981) (award remitted to $3.5 million by trial court).

No one (except for a few academic commentators) questions the value of punitive damages as a deterrent. Unchecked punitive damages awards, however, can have effects that are detrimental to society as a whole. From 1977 to 1985, for example, liability claims against small-plane manufacturers rose from $24 million to $210 million. Beech, Cessna and Piper curtailed or stopped production because of the increased costs. The market for small planes then became dominated by older used planes that were much less safe than the new ones that Beech, Cessna and Piper could have produced. P. Huber, *Liability, the Legal Revolution and its Conse-*

*quences,* 161 (New York: Basic Books, 1988). Punitive damages, especially in the area of products liability, can create a chilling effect on new product research and development. *See Blankenship v. General Motors Corp.,* 185 W.Va. 350, n. 4, 406 S.E.2d 781, n. 4 (1991). *See also* V. Schwartz, L. Magarian, "Challenging the Constitutionality of Punitive Damages: Putting Rules of Reason on an Unbounded Legal Remedy," 28 *American Bus.Law J.* 485 (1990).

Although the award of punitive damages sometimes gets out of hand, a recent article in *The Wall Street Journal* demonstrates perfectly the need for high damage awards in some cases. In Helliker, "Unwelcome Guests, With Cut–Rate Inns Scrimping on Security, Criminals Move In," *Wall St. J.,* July 18, 1991 at A–1, Col. 6, the *Journal* noted the incredible injuries suffered by guests of Motel 6. Since September, 1990, at least three Motel 6 guests have been murdered, and since September, 1988, four women have been raped at one Fort Worth, Texas Motel 6. According to the article, these instances are not anomalies, but regular business at Motel 6. This "business" is made possible by lax Motel 6 security policies.

Until recently (*after the lawsuits began*), Motel 6 kept no records on crime at its motels. Locks are not changed on rooms when guests depart with keys, leaving open the potential of many unwelcome visitors. Motel 6 managers are given no security training and are encouraged to maintain occupancy rates of over 100 percent.[2] Motel 6 maintained these lax security policies because it made more money on the front end, and its insurance company was covering its rear end. After a $10 million jury award in a case resulting from one of the Forth Worth rapes, however, even Motel 6's insurer is taking notice. Although Motel 6 may not have guest security as a high priority, a $10 million jury verdict encourages its insurer to keep better tabs on the way Motel 6 does business.

**2.** The only way to obtain an occupancy rate over 100 percent is to rent rooms more than once in a day. It isn't difficult to figure out who accounts for most of these "hourly" rentals.

As Judge Hand noted long ago in *United States v. Carroll Towing*, 159 F.2d 169 (2nd Cir.1947), any preventive action taken will have both costs and benefits. We want people to take all of *those precautions for which the benefits outweigh the costs,*[3] but only those precautions, and we want people to internalize, rather than externalize their costs whenever appropriate. *See* R.H. Coase, "The Problem of Social Cost," 3 *J. Law & Econ.* 1 (1960). This question of "externalization," of course, is peculiarly the problem with landfills—an activity that is both legal and socially useful—which is why the cynosure of landfill litigation must be *actual* damages.

Another function of punitive damages is to encourage good faith efforts at settlement. Often in lawsuits, there is a disparity of bargaining power between the plaintiff and defendant. In most cases, the defendant has a resource advantage over the plaintiff and is able to draw out a trial into a prolonged blizzard of mindless motions, countless continuances, and dreadful delays. Although this occurs less in West Virginia (where counsel can usually get to trial in a year) than in New York (where it routinely takes over four years to get to a jury), the defendant's ability to delay compensation and settle for pittances based on firepower and stalling tactics has been worrisome to courts. Courts sometimes rely upon legal fictions, such as lack of "good faith," to circumvent general prohibitions against fee-shifting, but the unstructured and nebulous nature of the rules concerning good faith settlement is directly related to the American rule that both sides in civil cases must pay their own attorneys' fees—win, lose, or draw. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

This American rule on fee-shifting makes sense in most cases. It makes it uneconomical for creditors to hound insolvent debtors relentlessly, and it makes it possible for injured victims to sue well-financed tortfeasors without the fear of personal bankruptcy if they should lose. However,

the fact that the general rule concerning fees works well most of the time does not necessarily imply that the rule works well all of the time. Several courts have held that, even in the absence of a statutory or contractual provision, attorneys' fees may be awarded to the claimant in insurance cases when the insurer has acted in bad faith, wantonly or for an oppressive reason. *See Montgomery Ward & Co., Inc. v. Pacific Indemnity Co.*, 557 F.2d 51 (3rd Cir. 1977); *Christian v. American Home Assur. Co.*, 577 P.2d 899 (Okla.1977); *Mustachio v. Ohio Farmers Ins. Co.*, 44 Cal. App.3d 358, 118 Cal.Rptr. 581 (1975).

Thus, a substantial number of American jurisdictions recognize the role of attorneys' fee awards in encouraging the prompt payment of valid claims. *See Meeks v. State Farm Mutual Automobile Ins. Co.*, 460 F.2d 776 (5th Cir.1972); *Universal Underwriters Ins. Co. v. Gorgei Enterprises, Inc.*, 345 So.2d 412 (Fla.App. 1977). As early as 1982 we recognized in principle the propriety of awarding attorneys' fees to prevailing claimants in property damage insurance cases. *See Nelson v. West Virginia Public Employees Ins. Board,* 171 W.Va. 445, 453–55, 300 S.E.2d 86, 95–96 (Neely, J., concurring). *See also Hayseeds, Inc. v. State Farm Fire & Cas.*, 177 W.Va. 323, 352 S.E.2d 73 (1986). Punitive damages can be a sword used by plaintiffs to even the odds. When a defendant has committed a wrongful act, we want to encourage him to settle the case promptly and fairly. By doing so, the defendant pays less money, the plaintiff gets his money quicker, and our courts become less crowded. Only some of the lawyers come out with less money, and the good ones aren't worried about how long their meters have been running anyway.

We believe that this rationale is consistent with U.S. Supreme Court precedent on punitive damages awards. In *Browning–Ferris, supra, Bankers Life and Cas. Co. v. Crenshaw*, 486 U.S. 71, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988), and *Aetna Life Ins.*

---

**3.** Speed limits are an example of cost/benefit calculations. A national speed limit of 35 miles per hour undoubtedly would decrease the number of deaths on our highways, but we would all go mad on long trips.

*Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986), the U.S. Supreme Court upheld punitive damages awards whose survival under the guidelines it has now enunciated in *Haslip* would at least be questionable. However, those results are not surprising if we consider the need for incentives to settle. And, indeed, *Eichenseer v. Reserve Life Ins. Co.,* 934 F.2d 1377 (5th Cir.1991) is an excellent post-*Haslip* example of this use of punitive damages. In *Eichenseer* the Fifth Circuit upheld an award of $500,000 in punitive damages in a case with only $1,000 in compensatory damages. Reserve Life Insurance Company treated Ms. Eichenseer outrageously every step of the way and when Ms. Eichenseer got fed up enough to sue, Reserve didn't have the good sense to settle. *Eichenseer* at 1379, 1380. The jury understood the message they were sending to Reserve and so did the Fifth Circuit when it affirmed the award.

### III.

In *Haslip* the U.S. Supreme Court decided for the first time that certain punitive damages awards could violate the due process clause of the Fourteenth Amendment. The Court decided, however, that the award in *Haslip* did not violate due process. In reviewing the award, the Court considered three major factors.

First, although the jury was given significant discretion in determining the punitive damages award, its discretion was not unlimited. The trial court described the purposes of punitive damages to the jury, providing limits for the exercise of jury discretion. As the U.S. Supreme Court said:

> The instructions thus enlightened the jury as to the punitive damages' nature and purpose, identified the damages as punishment for civil wrongdoing of the kind involved, and explained that their imposition was not compulsory.

*Haslip* at ——, 111 S.Ct. at 1044. The Court determined that the jury's discretion was "exercised within reasonable constraint," thereby satisfying due process.

Second, after the jury awarded punitive damages, the trial court examined the award using guidelines previously established by the Supreme Court of Alabama. The Alabama Supreme Court's guidelines required the trial court "to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages." The court could consider: the "desirability of discouraging others from similar conduct," the "impact upon the parties," and "other factors, such as the impact on innocent third parties." *Haslip* at ——, 111 S.Ct. at 1044. The U.S. Supreme Court found that these guidelines insured a "meaningful and adequate review by the trial court" of punitive damages awards. *Haslip* at ——, 111 S.Ct. at 1044.

Third, the U.S. Supreme Court found that the detailed appellate review provided by the Alabama Supreme Court of punitive damages awards was important in guaranteeing due process. The Alabama Supreme Court, by its use of the *"Green Oil* factors," insures that awards do "not exceed an amount that will accomplish society's goals of punishment and deterrence." *Green Oil Company v. Hornsby,* 539 So.2d 218, 222 (Ala.1989).

The *Green Oil* factors are:

(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.

(2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.

(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should

be in excess of the profit, so that the defendant recognizes a loss.

(4) The financial position of the defendant would be relevant.

(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.

(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.

(7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award.

*Green Oil v. Hornsby*, 539 So.2d 218, 223–224 (1989) (quoting Houston, J., concurring specially in *Aetna Life Ins. Co. v. Lavoie*, 505 So.2d 1050, 1062 (Ala.1987)).

Finally, the U.S. Supreme Court considered the effectiveness of appellate court review. The Alabama Supreme Court did not set out the *Green Oil* factors, later to ignore them. The Alabama Supreme Court has, in some cases, reduced punitive damages awards based on these factors.

### IV.

We believe that the U.S. Supreme Court's adoption of punitive damages standards is a major step in the unification of America's decisional law in matters where the separate states are unable to craft a set of rational rules. *See* M. Olson, *The Logic of Collective Action*, revised edition (Cambridge, Mass.: Harvard University Press, 1971). *See also* M. Olson, *The Rise and Decline of Nations* (New Haven, Ct.: Yale University Press, 1982). State courts have adopted standards that are, for the most part, not predictable, not consistent and not uniform. Such fuzzy standards inevitably are most likely to be applied arbitrarily against out-of-state defendants. Moreover, this is a problem that state courts are by themselves incapable of correcting regardless of surpassing integrity and boundless goodwill. State courts cannot weigh the appropriate trade-offs in cases concerning the *national* economy and *national* welfare when these trade-offs involve benefits that accrue outside the jurisdiction of the forum and detriments that accrue inside the jurisdiction of the forum.

A state court, for example, is not capable of deciding the appropriate trade-off between the value of cheap mass inoculations for such diseases as polio, and the rights of individuals unlucky enough to contract the disease from the vaccine. If, to encourage universal vaccination, the West Virginia Supreme Court of Appeals rules that a person contracting polio from the Sabin vaccine is entitled only to net economic losses and not pain and suffering or punitive damages, we have no assurance that courts in California or Massachusetts will not put vaccine manufacturers out of business or drive up the price of vaccine by adopting a far more generous rule for their own local plaintiffs—one that allows open-ended awards for pain and suffering and high levels of punitive damages.

In 1986, Congress enacted a statute that attempted to deal with this problem. The statute set up a useful no-fault scheme for handling weak claims against vaccine manufacturers when the plaintiff happens to be the one inoculee in a million who has a serious reaction to a standard vaccine. However, strong claims—where the plaintiff is likely to win a big award from a jury—are expressly exempted from the operation of the bill, which leaves most of the problems that the statute was supposed to solve exactly where they were before the statute was enacted. *See* 42 U.S.C. 300aa–11 (1986). The West Virginia Supreme Court of Appeals can do nothing, however, that will have any impact whatsoever on the set of economic trade-offs that occur in the national economy. As we noted in *Blankenship v. General Motors, supra*, trying unilaterally to do so will only punish West Virginians without improving the system for anyone else.

The idea that the U.S. Supreme Court should provide guidance in some areas (really a sort of national common law) is not new, and the U.S. Supreme Court has adopted guidelines that have proved successful in bringing about order, national uniformity, and fairness to out-of-state de-

fendants in other areas of law. Most well-known are the procedural safeguards that the U.S. Supreme Court has set out in criminal law, a part of our federal system that has traditionally been harsh with strangers who lack money and local political contacts. *See* D. Black, *Sociological Justice,* (N.Y.: Oxford U. Press, 1989). *See also Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The U.S. Supreme Court has also established national guidelines for libel and slander cases against the media, particularly the national media who can be sued anywhere their publications are sold and can easily be served a heaping plate of home cooking. *See Harte–Hanks, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

■ Most similar, however, to the Court's intervention in punitive damages is the U.S. Supreme Court's supervision of state taxation of interstate commerce. A state cannot discriminate against interstate commerce by singling out imports or exports for special taxes, and when a state taxes the income or personal property of an interstate business, it must apply proportionate formulae that would yield fair taxes if applied by every other state. *See Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

Like the taxation of interstate commerce, unchecked punitive damages awards can lead to a "competitive race to the bottom." The competitive race to the bottom is caused by the desire to "help your own." In interstate taxation, this means that each state, left to its own devices, would tax goods made in other states more heavily than goods made locally. This would give local manufacturers a competitive advantage, and it would exact revenue from entities that cannot respond politically. Similarly, states that have a natural advantage in their production of some desirable commodity (as West Virginia does with electricity), would exploit inelasticities of demand elsewhere by taxing out-of-state sales of that desirable commodity more heavily than in-state sales. Thus, the U.S. Supreme Court has checked what would otherwise be the disastrous effects of natural dynamics, and has developed rules mandating non-discrimination in interstate taxation. Similarly, local juries and local courts naturally will favor local plaintiffs over out-of-state (often faceless, publicly held) corporations when awarding punitive damages. Inevitably, this race (whether in taxation or damages awards) leads to increasing efforts to redistribute wealth from without the state to within. Such increases are necessary just to keep up with "the state next door" that has already increased its taxes or loosened its damages awards guidelines.

In *Hospital Authority of Gwinnett County v. Jones,* 261 Ga. 613, 409 S.E.2d 501 (1991), the Supreme Court of Georgia offers a well-reasoned opinion in a case where punitive damages were properly upheld under *Haslip,* in order to deter future similar conduct by the defendant and others.[4] However, we disagree with the Georgia Supreme Court's interpretation of *Haslip.* We believe that *Haslip* offers more than mere platitudes, as the learned judge in *Jones* off-handedly opines. As Professor Victor Schwartz, the current revisor of Prosser, Wade and Schwartz, *Cases and Materials on Torts* (8th ed. 1988), and perhaps America's foremost authority on tort matters, has said:

> [*Haslip*] presents an opportunity for state judges and legislators to form fair and reasonable guidelines in the area of punitive damages—guidelines that balance the interests of injured parties against those who face an unfettered and

---

**4.** In *Jones* the Hospital Authority had "a policy of bypassing emergency care at a nearby hospital ... in order to utilize the authority's own hospitals." Mr. O'Kelley was injured in a helicopter crash as a result of this policy, but he died several days later as a result of his original injuries. Therefore his estate received only nominal compensatory damages.

unlimited system of punishment.... The [U.S. Supreme Court has] vested responsibility in state courts to develop fair and reasonable rules and guidelines.

V. Schwartz, L. Magarian, "Forming Guidelines Out of Vagueness: How State Courts Can Implement *Haslip*," 2, 6 (Draft, under review for publication in *State Court Journal.*)

Professor Schwartz also said:

[I]t would be wiser ... for state judges to appreciate the spirit as well as the somewhat vague letter of *Haslip.* ... [The U.S. Supreme Court] was restricting states' rights and the creative ability of state judges and legislators to clean up the punitive damages mess and render the system fair. If states are responsive to this message, the Court is unlikely to intervene again. If they are not we can expect more Supreme Court cases ... in this important area of state law.

*Id.* at 19, 20.

At least two courts have taken the U.S. Supreme Court seriously and have cited *Haslip* in overturning punitive damages awards. *See Mattison v. Dallas Carrier Corp.*, 947 F.2d 95 (4th Cir.1991); *Alexander & Alexander, Inc., et al. v. B. Dixon Evander & Assoc., Inc.*, 88 Md.App. 672, 596 A.2d 687 (1991). *See also Bradley v. Hubbard Broadcasting, Inc.*, 471 N.W.2d 670 (Minn.Ct.App.1991). The Supreme

Court of Nevada, however, cites *Haslip* as a wholesale endorsement of punitive damages. *See Republic Ins. Co. v. Hires*, 107 Nev. 317, 810 P.2d 790 (1991). It is not! We must remember that although *Haslip* may not have created the clear, bright-line rules that we would all like, it is the beginning of national common law development in this area and not the end.

We believe that in *Haslip*, the U.S. Supreme Court has set out guidelines governing punitive damages awards as it has in the other areas of the national law discussed above. But, we understand as well as the next court how to imitate the intermediate appellate court of Texas in *Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768 (Tex. App.—Houston [1st Dist.] 1987), articulate the correct legal principle, and then perversely fit into that principle a set of facts to which the principle obviously does not apply.[5] Even judges who are remarkably dim bulbs know how to mouth the correct legal rules with ironic solemnity while avoiding those rules' logical consequences.

## V.

■ In *Haslip*, the U.S. Supreme Court considered the following three general criteria in upholding a punitive damages award: (1) a reasonable constraint on the jury's discretion; (2) a meaningful and adequate review of the award by the trial

---

5. *Pennzoil,* one of America's most shocking punitive damages cases, is a primer on squeezing incorrect results out of straightforward law. For example, the court goes into great detail explaining New York law about the binding effects of preliminary agreements. What the court takes two pages to tell us is that for parties to be bound by a preliminary agreement, they must have intended to be bound by it. *Pennzoil* at 788, 789. The court repeats different formulations of this simple legal rule from at least five different New York cases. The court then finds that the parties did intend to be bound by the preliminary agreement despite: (1) press releases which stated that "the transaction is subject to execution of a definitive merger agreement;" (2) wording in the preliminary agreement which stated that the parties' obligations would become binding only "after the execution and delivery of this agreement;" and, (3) references in press releases to the preliminary agreement as an "agreement in principle." *Pennzoil* at 789. The court unashamedly found

that the parties did not "clearly express the intent ... not to be bound." *Pennzoil* at 790. The Texas Supreme Court then summarily denied review of the case.

Although the name Texaco suggests that the company might get a friendly hearing in Texas, this has long since ceased being the case. Texaco long ago stopped wearing cowboy boots and ten-gallon hats, moved its corporate headquarters to the suburbs of New York City, and tried very hard to forget its humble origins in the Texas boondocks. Pennzoil, on the other hand, continues to maintain its corporate headquarters in Houston. And so it came to pass that Pennzoil sued Texaco in a friendly, hometown Texas state trial court where it recovered a judgment (including a punitive damages award of $3 *billion* ) that, after the inclusion of interest and costs, exceeded the gross national product of over one-quarter of the member states of the United Nations because of trumped up law and hard core home cooking.

court using established procedures; and (3) a meaningful and adequate review by the appellate court. We find that the review given the award in the case now before us by the trial court and then by this Court on the original petition were neither meaningful nor adequate under the standards established in *Haslip.*

In the case now before us, the trial court limited its review to very unrestrictive standards. The trial court stated:

Courts must not set aside jury verdicts as excessive, unless they are monstrous, enormous, beyond all measure, unreasonable, outrageous and manifestly show jury passion, impartiality [sic], prejudice or corruption (citing *Muzelak v. King Chevrolet, Inc.,* 179 W.Va. 340, 368 S.E.2d 710 (1988)).

The trial court also stated:

Only where the award of punitive damages has no foundation in the evidence so as to evince passion, prejudice or corruption in the jury should the award be set aside as excessive (citing *Wells v. Smith,* 171 W.Va. 97, 297 S.E.2d 872 (1982)).

These guidelines provide insufficient review by the trial court of punitive damages awards. The trial court also considered the fact that the jury awarded punitive damages without a finding of compensatory damages, but in light of our holding in Syllabus Point 3 of *Wells v. Smith,* 171 W.Va. 97, 297 S.E.2d 872 (1982), the trial court did not interfere with the verdict on this ground.[6]

■ Today, we find that our holding in Syllabus Point 3 of *Wells* is inconsistent with *Haslip.* Punitive damages should bear a reasonable relationship to the poten-

tial of harm caused by the defendant's actions and that generally means that punitive damages must bear a reasonable relationship to actual damages because compensatory damages provide a reasonable measure of likely harm. However, in the narrow exception like that before the Georgia Supreme Court in *Jones,* where the actual harm was minimal but the potential harm was tremendous, a jury may reasonably find punitive damages commensurate with the potential harm.[7] As the U.S. Supreme Court said in discussing the Alabama Supreme Court's review procedure in *Haslip:*

The Alabama Supreme Court's postverdict review insures that punitive damages awards are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages.

*Haslip* at ——, 111 S.Ct. at 1045.

Therefore, we overrule Syllabus Point 3 of *Wells* to the extent that it stands for the proposition that a jury may return an award for punitive damages without finding *any* compensatory damages.

### VI.

■ Following the dictates of *Haslip,* we here set out a new system for the review of punitive damages awards in West Virginia. Foremost is our concern that there be: (1) a reasonable constraint on jury discretion; (2) a meaningful and adequate review by the trial court using well-established principles; and (3) a meaningful and adequate appellate review.

■ When the trial court instructs the jury, the court should carefully explain

---

6. In Syllabus Point 3 of *Wells* we said:

Where there is evidence implicating the defendant as an active participant in a tortious plan or scheme which deliberately disregards the rights of others, and the jury returns compensatory damages against some of those involved in the scheme, the failure of the jury to return an award of compensatory damages against a particular defendant will not of itself allow that defendant to escape liability for punitive damages assessed against him.

7. We believe this to be a very narrow exception to a general rule, and it certainly provides an

"understandable relationship" with actual damages. Punitive damages should provide the appropriate disincentive when no other disincentive will deter future bad conduct. For example, a gunman who attempts to rob a bank but fails and is captured may do little actual damage, but we certainly want to deter future gunmen. That is why the penalty in this state for attempted aggravated robbery is the same as for successful aggravated robbery. However, in the case of a robbery, we do not use punitive damages, but criminal law to deter the wrongdoer.

the factors to be considered in awarding punitive damages. The court should apply the following principles which we infer from *Haslip, Green Oil,* and earlier U.S. Supreme Court cases on punitive damages such as *Browning–Ferris.*

(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be much greater.

(2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.

(3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant.

(4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.

(5) The financial position of the defendant is relevant.

Due process demands not only that penalties be abstractly fair, but also that a person not be penalized without reasonable warning of the consequences of his acts.

When the trial court reviews an award of punitive damages, the court should consider the factors explained to the jury as well as the following other factors taken from *Haslip* and *Green Oil:*

(1) The costs of litigation. (We want to encourage plaintiffs to bring wrongdoers to trial.);

(2) Any criminal sanctions imposed on the defendant for his conduct. (Any sanctions should mitigate the punitive damages award.);

(3) Any other civil actions against the same defendant, based on the same conduct. (Any other awards should mitigate the punitive damages award.); and

(4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff.

We do not give all of the factors to the jury because the jury will not possess all of the information necessary to use the factors properly. Furthermore, although we understand that juries often take such factors as failure to offer prompt settlements into account, offering evidence on the negotiation process and giving specific instructions will make the whole system worse rather than better. Yet juries understand these things intuitively from the whole ambiance of the trial and the court can inquire about such matters specifically. The judge, then, has all relevant information and should apply all of the factors in his or her review of the award. Because all of the information is not available to the jury, it is likely that in some cases the jury will make an award that is reasonable on the facts as the jury know them, but that the trial court will be required to adjust the award downward because of information available to him or her that would have been prejudicial to the defendant if presented to the jury. *See* Rule 403, *West Virginia Rules of Evidence.*[8] However, at the

---

**8.** Under Rule 403, we exclude evidence whose probative value is substantially outweighed by the danger of unfair prejudice.

option of the defendant, or in the sound discretion of the trial court, any of the above factors may be presented to the jury.

The extra factors that the judge must consider, although not relevant to the determination of culpability, are important in determining the constitutionality of any particular punitive damages award. For example, Jeff's Hot Dog Stand, which serves the local neighborhood, will be affected more strongly by a $20,000 punitive damages award than will McDonald's, which serves "billions and billions." We do not mean by this example, however, that an insurer should be allowed to use the financial straits of its insured to excuse its recalcitrance in the settlement process. As we noted in our discussion of Motel 6, *supra*, in a world where businesses can insure against almost anything, we must create the proper incentives not only for the potential "bad actors," but for their insurers as well. Passengers fly foreign airlines not because they trust Third World mechanics, but because they trust Lloyds of London and Lloyds' inspectors.

Therefore, we disagree with *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95 (4th Cir.1991), in which the Fourth Circuit reversed a punitive damages award of $100,000 and remanded for a new trial. The court believed in *Mattison* that the low net worth of the Dallas Carrier Corporation ($6,428) was an important factor that should have been considered more strongly. Although Dallas Carrier's net worth may have been low, Dallas Carrier must have been insured. All states require motorists to carry liability insurance, and those requirements are usually even higher for freight carriers like Dallas Carrier than for ordinary motorists. If the award of $100,000 was reasonable considering all the other factors, the insurer should not have been allowed to plead Dallas Carrier's poverty, or at least that is how we read *Haslip*. If Dallas Carrier's actions merit punitive damages, then its insurer must take the hit as an integral part of its failure to settle the case in the same way that the plaintiff takes the hit for not settling when the jury returns a verdict for the defendant. Of course, the Fourth Circuit is right for those unusual cases where no insurance carrier is involved (which, for all we know, *might* even have been the case with Dallas Carrier.)

Consequently, in West Virginia we do not interpret *Haslip* as precluding the judge from taking into consideration the defendant's insurer's ability to pay and all efforts towards settlement when the court undertakes his or her post-verdict review of a punitive damages award as discussed *supra*. Nonetheless, as is current practice, we would not have the subject of insurance raised before the jury, nor would we have any explicit argument about settlement offers or the defendant's carrier's recalcitrance in the face of clear liability on the part of the insured presented to the jury. However, these are fit subjects to instruct the trial judge's understanding of the appropriateness of a particular punitive award at the post-trial review stage when the judge is asked either to set the award aside entirely or enter a remittitur. *See* Syllabus Point 6, *Roberts v. Stevens Clinic Hospital, Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986). When reviewing the punitive damages award, a West Virginia trial court should thoroughly set out the reasons for changing (or not changing) the award.

After the trial court has examined and ruled on the punitive damages award, the losing party may petition for appeal to this Court. In our review of the petition, we will consider the same factors that we require the jury and trial judge to consider, and all petitions must address each and every factor set forth in Syllabus Points 4 and 5 of this case with particularity, summarizing the evidence presented to the jury on the subject or to the trial court at the post-judgment review stage. Assignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law.

### VII.

For reasons set forth above, the judgment of the Circuit Court of Kanawha County is reversed, and this case is re-

manded for a new trial consistent with this opinion.

Reversed and remanded.