## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Barbara Dean, as Administratrix of the**
**Estate of M.M.,**
**Plaintiff Below, Petitioner**

**FILED**

**October 18, 2019**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)  No. 18-0642** (Raleigh County 16-C-421-H)

**Jorge Gordinho, M.D.,**
**Responsible Pain & Aesthetic Management, PLLC,**
**and Alleghany Medical Services, P.C.,**
**Defendants Below, Respondents**

## MEMORANDUM DECISION

Petitioner Barbara Dean, as Administratrix of the Estate of M.M., by counsel James D. McQueen, Jr., and Christopher J. Heavens, appeals the June 14, 2018, order of the Circuit Court of Raleigh County that granted summary judgment to Respondents Jorge Gordinho, M.D.; Responsible Pain & Aesthetic Management, PLLC; and Alleghany Medical Services, P.C. All three respondents, by counsel Joseph M. Farrell, Jr., filed a response in support of the circuit court's order. Respondent Alleghany Medical Services, by counsel Matthew E. Kelley, filed an additional response in support of the circuit court's order. Petitioners filed a reply.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On August 13, 2013, Lisa Walker, a nurse practitioner at Respondent Alleghany Medical Services P.C. ("AMS"), evaluated M.M. ("decedent"). Decedent complained of pain in her back and other areas of her body. The nurse practitioner noted that decedent had been prescribed Suboxone (a combination of buprenorphine and naloxone used to treat opiate addiction), but discontinued it and prescribed instead Cymbalta (for depression) and Ultram (a narcotic-like pain reliever). The nurse practitioner also ordered an MRI of decedent's cervical spine and referred decedent to Respondent Responsible Pain & Aesthetic Management, PLLC ("RPAM").

Two days later, on August 15, 2013, decedent saw Respondent Dr. Jorge Gordinho at RPAM. Dr. Gordinho searched the State pharmacy database and discovered decedent had abused opioids in the past and had recently participated in a Suboxone program. Decedent's urine screen showed that she had no opioids in her system. Dr. Gordinho diagnosed decedent with degenerative disk disease and lumbago and prescribed a thirty-day course of oxycodone, an opioid medication.

1

At decedent's second appointment with Dr. Gordinho on September 10, 2013, Dr. Gordinho tested decedent's urine. The lab report indicated that decedent's urine was diluted and positive for substances not prescribed by Dr. Gordinho, including Tramadol (a narcotic-like pain reliever). Dr. Gordinho refilled decedent's oxycodone prescription before her last such prescription ran out.

At decedent's third appointment on October 8, 2013, Dr. Gordinho refilled her oxycodone prescription and prescribed Ultram. Thereafter, decedent's mother, who is now the representative of decedent's estate and the petitioner in this appeal, sent Dr. Gordinho a letter asking him to stop prescribing opioids to decedent because she was a drug addict. The undated letter was placed in decedent's medical file at Dr. Gordinho's office sometime after October 8, 2013.

At decedent's fourth appointment with Dr. Gordinho on October 30, 2013, he gave her a prescription for oxycodone fourteen days before her last such prescription ran out because decedent said she sprained her ankle. Dr. Gordinho also discussed with decedent the letter decedent's mother wrote to Dr. Gordinho.

At decedent's fifth appointment with Dr. Gordinho on November 13, 2013, she presented with claims of worsened pain. Dr. Gordinho refilled her oxycodone prescription and increased the dosage by fifty percent.

Decedent had her sixth and final appointment with Dr. Gordinho on December 11, 2013, at which she claimed to have greater pain. Dr. Gordinho reviewed decedent's urinalysis from her last appointment and found that it did not contain the oxycodone metabolites that should have been in her urine. As a result, Dr. Gordinho discharged decedent as a patient.

One week later, on December 18, 2013, decedent saw Dr. Hassan Asghar Jafary and complained of depression and neck and back pain. Decedent told Dr. Jafary that Dr. Gordinho had previously treated her. However, decedent did not tell Dr. Jafary that Dr. Gordinho had discharged her from his care. Dr. Jafary refused to prescribe pain medication but, instead, referred her to a mental health provider. Dr. Jafary next saw decedent nine months later, on August 21, 2014, at which time he diagnosed her with "opioid type dependence - continuous use" and re-enrolled her in a Suboxone program. Decedent saw Dr. Jafary again on August 22 and 29, 2014, to continue with Suboxone monitoring.

On September 5, 2014, decedent visited the office of Dr. Faheem where she claimed that someone had stolen her medications. The office staff advised petitioner that Dr. Faheem did not replace lost or stolen medication; however, the staff told her that Dr. Faheem would "detox" decedent. Decedent refused that service.

Decedent saw Dr. Yasar Aksoy on September 11, 2014, who prescribed her hydrocodone, an opioid. Decedent filled the prescription on October 1, 2014. She died the next day, October 2, 2014. The medical examiner opined that decedent's death resulted from oxymorphone, hydrocodone, and diazepam intoxication.

Petitioner brought this action against respondents and other medical providers, including Dr. Aksoy.[1] Specifically, petitioner filed this action on June 28, 2016, twenty-one months after decedent died, thirty months after Dr. Gordinho last treated decedent, and thirty-four months after the nurse practitioner at AMS last treated decedent. Dr. Lloyd Saberski, MD, issued petitioner's certificate of merit,[2] in which he opined that (1) Dr. Gordinho deviated from an acceptable medical practice when he prescribed decedent oxycodone; (2) Dr. Gordinho undermined decedent's recovery and rekindled her addiction, which contributed to her death; (3) Dr. Gordinho deviated from acceptable medical practice in failing to provide the proper disposition of decedent as a patient; and (4) but for Dr. Gordinho's deviations, there was a reasonable degree of medical probability that decedent would not have died on October 2, 2014.

On February 7, 2018, respondents filed a joint motion for summary judgment asserting that the two-year statute of limitations for a medical malpractice claim barred petitioner's claims. *See* W. Va. Code § 55-7B-4(a) (1986).[3] On February 8, 2018, AMS filed an additional motion for summary judgment contending that petitioner failed to allege any ground for relief against it. Specifically, AMS argued that, although petitioner's complaint mentioned decedent saw AMS's nurse practitioner on August 13, 2017, petitioner never alleged that the nurse practitioner's care was negligent or that her actions led to decedent's death. AMS also highlighted that petitioner's standard of care expert, Dr. Saberski, conceded he had no criticisms of AMS's nurse practitioner's care of decedent. Petitioner responded to AMS's motion for summary judgment and argued that the basis for liability against AMS was that Dr. Gordinho owned AMS, and operated it as his "alter ego."[4]

On June 14, 2018, the circuit court granted respondents' motion for summary judgment. The circuit court found as follows: Petitioner argues that this case is a wrongful death action and that the statute of limitations did not start running until the date of decedent's death. However, the evidence showed that this is a medical negligence action, not a wrongful death action. The circuit court also found that there were numerous intervening causes between the date Dr. Gordinho discharged decedent as a patient and the date decedent died. Therefore, the circuit court concluded that any alleged medical negligence by Dr. Gordinho must be considered separately from the alleged wrongful acts that caused her death. The circuit court noted that decedent's last contact with Dr. Gordinho was on December 11, 2013, and that, under the Medical Professional Liability Act (the "MPLA"), West Virginia Code § 55-7B-4, petitioner was required to file her action within two years of the last date of injury. The circuit court concluded that petitioner did not file her action within two years of decedent's last treatment by Dr. Gordinho, RPAM, and AMS, that is, by December 11, 2015. The circuit court also ruled that the deadline for petitioner to file her action against Dr. Gordinho might have been earlier than December 11, 2015, given that (1) petitioner

---

[1] The parties indicate that petitioner secured a default judgment against Dr. Yasar Aksoy, the physician who last treated decedent.

[2] *See generally* West Virginia Code § 55-7B-6.

[3] The statute of limitations for medical malpractice actions, West Virginia Code § 55-7B-4, was modified by the Legislature in 2017. These modifications do not affect this case.

[4] Petitioner subsequently moved to amend her complaint against Respondent AMS to add an "alter ego" theory of liability. The circuit court does not appear to have ruled on the motion, but, instead, granted summary judgment to all three respondents.

wrote Dr. Gordinho in October of 2013 and asked him to cease prescribing oxycodone to decedent, and (2) Dr. Gordinho discussed this letter with decedent. Thus, the circuit court concluded that both decedent and her mother were aware of a possible medical negligence action as early as October of 2013.

Petitioner now appeals the circuit court's order granting summary judgment to respondents. As we have oft said, "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). Our review is guided by the principle that

>"'[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.' Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963)." Syllabus Point 1, *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992).

*Painter*, 192 W. Va. at 190, 451 S.E.2d at 756, syl. pt. 2. Furthermore,

>"[s]ummary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syllabus point 4, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

Syl. Pt. 5, *Toth v. Bd. of Parks & Recreation Comm'rs*, 215 W. Va. 51, 593 S.E.2d 576 (2003).

Petitioner raises three assignments of error on appeal. Petitioner makes the following arguments with regard to her first assignment of error: The circuit court erred in finding that she brought a medical malpractice action, and not a wrongful death action. Petitioner claims decedent's death resulted from two combined acts: medical negligence and wrongful death because the medical negligence caused the wrongful death. Petitioner also argues that the circuit court erred in finding this case was barred by the MPLA's two-year statute of limitations in West Virginia Code § 55-7B-4. Instead, petitioner contends the two-year statute of limitations in the Wrongful Death Act, West Virginia Code § 55-7-6, controls. That section provides that a wrongful death action must "be commenced within two years after the death of such deceased person." Therefore, petitioner argues that the statute of limitations began to run, at the earliest, on October 2, 2014, the day decedent died, and that she filed this action less than two years later, on June 28, 2016.

Petitioner's first assignment of error is based on a misunderstanding of the circuit court's order. The circuit court did not exclusively rule that petitioner's case was barred by the two-year statute of limitations found in the MPLA. Instead, it ruled (1) with regard to petitioner's wrongful death action, numerous intervening causes precluded petitioner from pursuing such an action against respondents; (2) petitioner's claim against respondents stood alone as a medical negligence claim; and, therefore, (3) the MPLA's statute of limitations barred the medical negligence claim against respondents.

4

West Virginia Code § 55-7B-4 requires a plaintiff to file a medical negligence action within two years of the date of injury, unless an exception applies. Petitioner filed this action on June 28, 2016, thirty months after Dr. Gordinho last treated decedent, and thirty-four months after the nurse practitioner at AMS treated her. Clearly, both time periods are outside the two-year statute of limitations found in the MPLA. Further, petitioner never argued that any exception to West Virginia Code § 55-7B-4 applies. Accordingly, the circuit court did not err in finding that the MPLA's two-year statute of limitations barred petitioner's claims against respondents.

As for petitioner's wrongful death claim, she now claims that the "injury" in this case was decedent's death. However, in petitioner's complaint, she clearly alleged that Dr. Gordinho negligently injured decedent beginning at his first appointment with decedent on August 15, 2013, and ending with the last appointment on December 11, 2013. Importantly, the complaint also alleged that Dr. Aksoy was negligent on September 11, 2014, when he prescribed decedent hydrocodone shortly before decedent's death.

Petitioner cites to no evidence in the record to contradict the circuit court's conclusion that intervening causes – namely, the actions of Dr. Aksoy – precluded her wrongful death action against respondents.[5] For example, petitioner did not offer any evidence tending to show that Dr. Gordinho negligently caused decedent to chronically abuse opioids, which in turn caused decedent's death. Instead, the evidence showed decedent had a longstanding problem with drug abuse, and petitioner offered no evidence that decedent was no longer abusing drugs when Dr. Gordinho first began treating decedent.[6] In fact, petitioner's expert, Dr. Saberski, admitted that decedent's medical records showed that (1) decedent sought drugs from a different doctor two weeks before she saw Dr. Gordinho; and (2) decedent admitted to a therapist on September 6, 2013, that yet another doctor stopped prescribing Ativan (for anxiety) to her because her drug screens revealed decedent had drugs in her system for which she did not have a prescription. Dr. Saberski also admitted that, based on decedent's behaviors, she would have continued to be a drug addict even if she had never met Dr. Gordinho. Finally, in a letter to petitioner's counsel on January 10, 2016, Dr. Saberski opined that Dr. Aksoy caused decedent's death by prescribing her hydrocodone. Accordingly, the record clearly supports the circuit court's conclusion that Dr. Aksoy's actions were an intervening cause of decedent's death.

With regard to Respondent AMS, petitioner fails to make any argument or point to any evidence in the record in support of her claim that AMS is legally liable for decedent's death. Further, petitioner did not show below, and did not argue to this Court, (1) that AMS rendered

---

[5] "An intervening cause, in order to relieve a person charged with negligence in connection with an injury, must be a negligent act, or omission, which constitutes a new effective cause and operates independently of any other act, making it and it only, the proximate cause of the injury." Syl. Pt. 16, *Lester v. Rose*, 147 W. Va. 575, 130 S.E.2d 80 (1963), *modified on other grounds*, *State ex rel. Sutton v. Spillers*, 181 W. Va. 376, 382 S.E.2d 570 (1989).

[6] Petitioner's expert, Dr. Saberski, testified that he did not know if decedent was an active addict or a "recovered" addict when she first saw Dr. Gordinho, and that there was no evidence in the record proving that decedent had recovered from her drug addiction before she saw Dr. Gordinho.

negligent care to decedent; (2) how AMS's treatment of decedent could have led to her death; or (3) that Dr. Gordinho treated decedent while she was a patient at AMS. In fact, petitioner's standard of care expert, Dr. Saberski, conceded that he found no fault with the care decedent received from AMS's nurse practitioner. Accordingly, we find that the circuit court did not err in granting AMS's motion for summary judgment. *See generally, Garnes v. Fleming Landfill*, 186 W. Va. 656, 669, 413 S.E.2d 897, 910 (1991) ("Assignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law."); *Morris v. Painter*, 211 W. Va. 681, 685 n.2, 567 S.E.2d 916, 920 n.2 (2002) ("[A]ll issues not wished to be waived should have been included in the appellate brief."); W. Va. R. App. P. 10(c)(7) ("The brief must contain an argument exhibiting clearly the points of fact and law presented . . . [and] appropriate and specific citations to the record on appeal . . . . The Court may disregard errors that are not adequately supported by specific references to the record on appeal.").

In petitioner's second assignment of error, she argues that the circuit court erred in finding that, when she wrote to Dr. Gordinho in October of 2013, and asked him to stop prescribing opioids to decedent, the statute of limitations began to run with regard to any MPLA-based action against Dr. Gordinho. Petitioner counters that she had no right or duty to bring a lawsuit against Dr. Gordinho until decedent died and, therefore, the two-year statute of limitations was not triggered until that date.

We disagree. As noted above, the circuit court properly concluded that Dr. Aksoy's negligent treatment of decedent was a substantial intervening cause that occurred after Dr. Gordinho treated decedent. Although petitioner showed that Dr. Gordinho might have been negligent in his treatment of decedent, she failed to show how Dr. Gordinho's negligence was a proximate cause of decedent's death. Thus, the circuit court correctly determined that the statute of limitations for an MLPA action against Dr. Gordinho was triggered no later than December 11, 2013, the last day Dr. Gordinho treated decedent. Finally, based on the contents of petitioner's October of 2013, letter to Dr. Gordinho, the circuit court also correctly determined that the statute of limitations may have begun to run for any MPLA action against Dr. Gordinho as early as October of 2013.

Petitioner's third and final assignment of error is that the circuit court erred in determining that, regardless of when the statute of limitations began to run, there were intervening causes precluding a wrongful death action against Dr. Gordinho. Petitioner argues that the circuit court should have allowed a jury to consider this issue. Petitioner further argues that, even if the circuit court did not err in finding there were intervening causes between decedent's injury and her death, under *Mack-Evans v. Hilltop Healthcare Center*, 226 W. Va. 257, 700 S.E.2d 317 (2010), decedent was not competent to understand that respondents injured her because she was a drug addict who denied her addiction. Thus, decedent's impaired mental state prevented her from bringing an action on her own behalf.

The evidence from petitioner's expert, Dr. Saberski, showed that decedent was an active drug addict when she began seeing Dr. Gordinho on August 15, 2013. Thus, petitioner's expert does not support petitioner's claim on appeal that Dr. Gordinho caused decedent to become an active drug addict. As for the intervening causes, they include that, after Dr. Gordinho terminated his relationship with decedent, she sought pain medication from three other doctors who wrote her

numerous prescriptions. Moreover, decedent died from taking drugs she did not get from a physician's prescription, i.e., oxymorphone and diazepam. Further, decedent's records show that she was not using opioids (the drugs prescribed by Dr. Gordinho to decedent) in March and April of 2014, thereby breaking the chain of continuous causation. Accordingly, we find no error in the order on appeal regarding the existence of intervening causes.

Lastly, petitioner counters the circuit court's intervening cause finding by arguing that it failed to recognize decedent lacked the mental competence to discern that Dr. Gordinho injured her and to bring a medical negligence claim against him on her own behalf. Petitioner further asserts that the statute of limitations for decedent's negligence claim was "tolled during the period of [her] mental disability" and that, "[i]n the event the injured person dies before the mental disability ends, the statute of limitations begins to run on the date of the injured person's death." *Mack-Evans*, 226 W. Va. at 259, 700 S.E.2d at 319, syl. pt. 5, in part. However, petitioner did not raise this claim below or place any evidence in the record to support it.[7] Thus, petitioner raises this argument for the first time on appeal. "Our general rule is that nonjurisdictional questions not raised at the circuit court level, but raised for the first time on appeal, will not be considered." *Shaffer v. Acme Limestone Co.*, 206 W. Va. 333, 349 n.20, 524 S.E.2d 688, 704 n.20 (1999). Accordingly, we decline to consider this claim.

For the foregoing reasons, we affirm the June 14, 2018, order that granted summary judgment to respondents.

Affirmed.

**ISSUED:** October 18, 2019

**CONCURRED IN BY:**

Chief Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins

**DISSENTING:**

Justice Margaret L. Workman

**DISQUALIFIED:**

Justice John A. Hutchison

---

[7] Decedent's medical records conflict with petitioner's claim that decedent lacked mental capacity. Specifically, on July 14, 2014, a healthcare provider noted that (1) decedent's mood was "pretty stable[]"; (2) she "was sleeping okay"; (3) she "was not experiencing any side effects from the medication[]"; (4) she was "alert, oriented and cooperative[]"; (5) she had "[n]o hallucinations or delusions; and (6) she "denie[d] being suicidal or homicidal."