608 S.E.2d 169

John BOYD, Markus Spear, Jason Brown, and Rich Fadse, Plaintiffs Below, Appellees,

v.

Tom GOFFOLI, Falcon Transport Company, A Corporation; John Magliocca, d/b/a J.J. Trucking Consultants, and John Magliocca, d/b/a Training Alternatives, Defendants Below,

Falcon Transport Company, A Corporation, Defendant Below, Appellant.

No. 31671.

Supreme Court of Appeals of West Virginia.

Submitted: Sept. 8, 2004.

Filed: Nov. 29, 2004.

William E. Watson, Esq., Christine Machel, Esq., William E. Watson & Associates, Wellsburg, for Appellees.

James A. Walls, Esq., Spilman Thomas & Battle, Morgantown, for Falcon Transport Company.

MAYNARD, Chief Justice.

Appellant and Defendant below, Falcon Transport Company, appeals the March 28, 2003, order of the Circuit Court of Brooke County that denied Appellant's motion for remittitur or, in the alternative, a new trial, and upheld the jury verdict which found that Appellant committed fraud against the four Appellees and awarded to each of them $75,000.00 in compensatory damages and $250,000.00 in punitive damages. Appellees cross-appeal the April 10, 2003, order of the Circuit Court of Brooke County that denied their request for attorney fees and litigation expenses. For the reasons that follow, we affirm both orders of the circuit court.

## I.

### FACTS

Falcon Transport Co., Appellant and Defendant below, is an Ohio Corporation in the business of commercial trucking which has a trucking terminal in Weirton, West Virginia. Appellees and Plaintiffs below, John Boyd, Markus Spear, Jason Brown, and Rich Fadse, are all West Virginia residents who applied with Appellant's recruiter in Weirton, Tom Goffoli, to become commercial truck drivers who would operate out of Appellant's Weirton terminal. Because Appellees did not have commercial driver's licenses, Goffoli informed them[1] that they would have to enroll in a truck driver training program in Sharon, Pennsylvania at a cost of $495.00 each and take a physical exam at a Pennsylvania clinic at a cost of $75.00. Finally, Goffoli explained, Appellees would be required to transfer their West Virginia driver's licenses to Pennsylvania, obtain their Pennsylvania commercial driver's licenses, and then transfer their commercial driver's licenses back to West Virginia. When Appellants inquired whether this license transfer scheme was legal, Goffoli informed them that it was perfectly legal and done all the time.

Appellees subsequently quit their jobs and drove daily to Pennsylvania to attend the truck driver training course. Upon initial arrival at the Pennsylvania course, Appellees were introduced to John Magliocca, a Defendant below, who contracted with Appellant to arrange each driving candidate's physical examination, drug test, and commercial driver's license examination. At trial, Appellant adduced evidence that, under the terms of its contract with Magliocca, a person by the name of Phil Hankey was responsible for actually training the driving candidates. Appellees testified, however, that they never met Hankey.

After paying the $495.00 fees, Appellees were provided by Magliocca with instructional booklets and other materials designed to assist them in obtaining their commercial driver's licenses. Among these materials was a memorandum indicating a Pennsylvania address that Appellees were to use as their residence when they applied to the Pennsylvania Department of Transportation (hereafter "PennDot") for their Pennsylvania commercial driver's permits and licenses. Appellees each obtained their permits by using the Pennsylvania address supplied by Magliocca.

When Appellees subsequently returned to the PennDot Office to take a vision and written examination to obtain their commercial driver's licenses, a PennDot employee inquired why all four Appellees listed the same address as their Pennsylvania residences. Appellees acknowledged that they were West Virginia residents and had been instructed by Magliocca to use the Pennsylvania address on their commercial driver's license applications. The PennDot employee then confiscated Appellees' Pennsylvania driver's licenses and commercial driver's license permits; advised them that they had

---

1. Three of the four Appellees actually spoke with Goffoli.

committed a crime; and placed them in a room for 45 minutes to an hour until the employee received further instruction on what to do with Appellees. Ultimately, Appellees were advised that no criminal charges would be filed and they were allowed to leave. Thereafter, Appellees rejected Appellant's offer to complete their training in West Virginia and Appellees' $495.00 training fees were refunded.

Appellees subsequently filed suit against Appellant, Goffoli,[2] and Magliocca[3] in the Circuit Court of Brooke County in which they alleged fraud, tortious conspiracy, and negligence.[4] After discovery was completed, Appellant and Magliocca offered to pay Appellees $52,500.00 to settle wherein $47,500.00 would be paid by Appellant and $5,000.00 would be paid by Magliocca. Appellees rejected the offer and made a counteroffer of $145,000.00 which was rejected. However, three days before trial, Appellees settled with Magliocca for $4,000.00, which was $1,000.00 less than previously offered by Magliocca, leaving Appellant as the only defendant in the case.[5]

The jury returned a verdict against Appellant for actual or constructive fraud and determined that Appellant was liable for Magliocca's fraud as a co-conspirator and joint venturer. It awarded $75,000.00 to each Appellee for wages, aggravation, and inconvenience, and $250,000.00 to each Appellee in punitive damages.

## II.

## DISCUSSION

### 1. Propriety of Punitive Damages Award

■ The first assignment of error raised by Appellant is that the circuit court violated fundamental principles of federalism, comity, and due process and committed constitutional error by upholding the jury's punitive damage award on the basis of an out-of-state "scheme" to violate Pennsylvania law.[6] As a preliminary matter, we note that our review of this issue is *de novo*. *See Phillip Leon M. v. Greenbrier Cty. Bd. of Educ.*, 199 W.Va. 400, 404, 484 S.E.2d 909, 913 (1996), *modified on other grounds by Cathe A. v. Doddridge County Bd. Of Educ.*, 200 W.Va. 521, 490 S.E.2d 340 (1997) (stating that "[b]ecause interpretations of the West Virginia Constitution, along with interpretations of statutes and rules, are primarily questions of law, we apply a *de novo* review"). *c.f. Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436, 121 S.Ct. 1678, 1685–86, 149 L.Ed.2d 674 (2001) (providing that "courts of appeals should apply a *de novo* standard of review when passing on district

2. According to Appellant, Goffoli was not timely served with a summons and complaint and was therefore dismissed from the action prior to trial pursuant to Rule 4(k) of the West Virginia Rules of Civil Procedure.

3. Also, Appellant filed a cross-claim against Magliocca for indemnity and contribution.

4. According to Appellant, Appellees abandoned their negligence claims at trial and proceeded only on their claims for fraud and tortious conspiracy.

5. After Magliocca's settlement with Appellees, Appellant faxed a letter to the circuit court informing the court that it intended to maintain its cross-claim for indemnity and contribution against Magliocca and requesting a continuance of the January 6, 2003, trial date which the circuit court denied. In its order denying Appellant post-trial relief, the circuit court found that Appellant advised the court at a pre-trial hearing that it would not pursue its cross-claim against Magliocca and declined the circuit court's offer to hold a hearing on the settlement.

6. Appellees assert that Appellant waived its challenge to the punitive damages award by filing no motions *in limine*, making no objections at trial concerning damages, failing to move for a directed verdict either at the end of Appellees' case or at the close of evidence, agreeing to the punitive damages instruction, and failing to raise out-of-state conduct as an issue in its post-trial motion. Appellant responds that it did not waive its right to challenge the constitutionality of the punitive damages award because it moved for summary judgment on the punitive damages claim, it challenged the constitutionality of the award in its post-trial motions and brief, and there was a change in the law relating to the constitutionality of punitive awards designed to punish extra-territorial conduct after the trial. Because we have chosen to address the merits of the constitutional challenge to the punitive damages award, and our disposition of the issue is favorable to Appellees, we decline to address Appellees' waiver claim.

courts' determinations of the constitutionality of punitive damages awards" (footnote omitted)).

Appellant now claims that it was improperly punished for a scheme to violate Pennsylvania law in contravention of *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). In support of this argument, Appellant points to comments made at trial by Appellees' counsel. For example, in her opening statement, counsel for Appellees mentioned that "[t]his case is about fraud, it's about conspiracy to violate the law in Pennsylvania[.]" In her summation, Appellees' counsel again mentioned punishing Appellant for not following the law. Appellant also asserts that the circuit court upheld the award based on the out-of-state scheme. Specifically, Appellant claims that the circuit court upheld the punitive damages award based on out-of-state conduct directed at non-West Virginians. To support this claim, Appellant avers that "there is no evidence in the record below that any other West Virginia residents attended [Appellant's] training center or were harmed by the scheme."

After close examination of the Supreme Court's pronouncements in *Campbell*, we find that the punitive damages award at issue does not violate that case. In *Campbell*, the insureds brought an action against their insurer, State Farm, to recover for bad-faith failure to settle within the policy limits and damages for fraud and intentional infliction of emotional distress. A jury awarded the insureds $2.6 million in compensatory damages and $145 million in punitive damages, which the trial court reduced to $1 million and $25 million respectively. On appeal, the Utah Supreme Court reinstated the $145 million punitive damages award. The United States Supreme Court subsequently reversed the punitive damages award because it found it to be "neither reasonable nor proportionate to the wrong committed," and "an irrational and arbitrary deprivation of the property of the defendant" in violation of the Fourteenth Amendment. *Campbell*, 538 U.S. at 429, 123 S.Ct. at 1526. In reaching this conclusion, the Supreme Court discussed the type of evidence that may be admitted in proving the appropriateness of punitive damages.

The insureds in *Campbell* sought to show the reprehensible conduct of State Farm by introducing evidence of State Farm's business practices for over 20 years in numerous states. The Court found this evidence to be improper. First, the Court said that "[a] State cannot punish a defendant for conduct that may have been lawful where it occurred." 538 U.S. at 421, 123 S.Ct. at 1522 (citations omitted). The Court explained, however, that

> Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff. A jury must be instructed, furthermore, that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred.

538 U.S. at 422, 123 S.Ct. at 1522–23 (citation omitted). Second, the Court expounded that, as a general rule, a State has no legitimate concern "in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction. Any proper adjudication of conduct that occurred outside Utah to other persons would require their inclusion, and, to those parties, the Utah courts, in the usual case, would need to apply the laws of their relevant jurisdiction." 538 U.S. at 421–22, 123 S.Ct. at 1522 (citation omitted).

The Court's conclusion that improper evidence was admitted in *Campbell* was based on its finding that,

> The courts awarded punitive damages to punish and deter conduct that bore no relation to the [insureds'] harm. A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business.

538 U.S. at 422–23, 123 S.Ct. at 1523. The Court further explained:

The [insureds] have identified scant evidence of repeated misconduct of the sort that injured them. Nor does our review of the Utah courts' decisions convince us that State Farm was only punished for its actions toward the [insureds]. Although evidence of other acts need not be identical to have relevance in the calculation of punitive damages, the Utah court erred here because evidence pertaining to claims that had nothing to do with a third-party lawsuit was introduced at length. Other evidence concerning reprehensibility was even more tangential. For example, the Utah Supreme Court criticized State Farm's investigation into the personal life of one of its employees and, in a broader approach, the manner in which State Farm's policies corrupted its employees. The [insureds'] attempt to justify the courts' reliance upon this unrelated testimony on the theory that each dollar of profit made by underpaying a third-party claimant is the same as a dollar made by underpaying a first-party one. For the reasons already stated, this argument is unconvincing. The reprehensibility guidepost does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance, which in this case extended for a 20-year period. In this case, because the [insureds] have shown no conduct by State Farm similar to that which harmed them, the conduct that harmed them is the only conduct relevant to the reprehensibility analysis.

538 U.S. at 423–24, 123 S.Ct. at 1523–24 (citations omitted).

First, we note that the facts of *Campbell* are clearly distinguishable from those in the instant case. The punitive damage award in *Campbell* was based on dissimilar lawful out-of-state conduct. In contrast, the instant case involves evidence of unlawful out-of-state conduct that actually injured Appellees. In other words, unlike in *Campbell*, the bulk of Appellees' evidence consisted of Appellees' testimony concerning Magliocca's conduct toward them which resulted in the damages of which they complained. Also, in the instant case, unlike in *Campbell*, no evidence was introduced of wrongdoing that was dissimilar to the kind of wrongdoing that harmed Appellees.

Further, this Court does not believe that the *Campbell* Court's broadly worded dictum that a state does not have a legitimate concern imposing punitive damages to punish a defendant's unlawful out-of-state conduct applies to the instant case. Significantly, in support of its declaration on the inappropriateness of using out-of-state conduct to punish a defendant, the Supreme Court cited *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), which concerned a nationwide class action. In *Shutts*, Petitioner was a Delaware corporation which had its principal place of business in Oklahoma. During the 1970's it produced or purchased natural gas from leased land located in 11 different states, and sold most of the gas in interstate commerce. Respondents were 28,000 of the royalty owners possessing rights to the leases from which petitioner produced gas. They resided in all 50 states, the District of Columbia, and several foreign countries. Respondents brought a class action against petitioner in a Kansas state court seeking to recover interest on royalty payments which had been delayed by petitioner. The Kansas court applied Kansas contract and equity law to every claim, despite the fact that over 99% of the gas leases and 97% of the plaintiffs in the case had no apparent connection to the State of Kansas except for the lawsuit, and found petitioner liable for interest on the suspended royalties. Petitioner contended that total application of Kansas substantive law violated the constitutional limitations on choice of law mandated by the Full Faith and Credit Clause of the Federal Constitution, Article IV, § 1.

The Supreme Court explained that "[w]e must first determine whether Kansas law conflicts in any material way with any other law which could apply. There can be no injury in applying Kansas law if it is not in conflict with that of any other jurisdiction connected to this suit." *Shutts*, 472 U.S. at 816, 105 S.Ct. at 2976. After determining that there were actual conflicts between Kansas law and the laws of the other states, the Court reasoned:

Kansas must have a "significant contact or significant aggregation of contacts" to the claims asserted by each member of the plaintiff class, contacts "creating state interests," in order to ensure that the choice of Kansas law is not arbitrary or unfair. *Allstate [Ins. Co. v. Hague* ], 449 U.S.[302], at 312–313, [101 S.Ct. 633, 640, 66 L.Ed.2d 521 (1981) ]. Given Kansas' lack of "interest" in claims unrelated to that State, and the substantive conflict with jurisdictions such as Texas, we conclude that application of Kansas law to every claim in this case is sufficiently arbitrary and unfair as to exceed constitutional limits.

When considering fairness in this context, an important element is the expectation of the parties. See *Allstate, supra, at* 333, [101 S.Ct. at 651] (opinion POWELL, J.). There is no indication that when the leases involving land and royalty owners outside of Kansas were executed, the parties had any idea that Kansas law would control. Neither the Due Process Clause nor the Full Faith and Credit Clause requires Kansas "to substitute for its own [laws], applicable to persons and events within it, the conflicting statute of another state," *Pacific Employers Ins. Co. v. Industrial Accident Comm'n*, 306 U.S. 493, 502[,] [59 S.Ct. 629, 633, 83 L.Ed. 940 (1939) ], but Kansas "may not abrogate the rights of parties beyond its borders having no relation to anything done or to be done within them." *Home Ins. Co. v. Dick, supra*, [281 U.S. 397] at 410 [50 S.Ct., 338, 342, 74 L.Ed. 926 (1930) ].

*Shutts*, 472 U.S. at 821–822, 105 S.Ct. at 2979–2980.

■ Reading the Supreme Court's pronouncements in *Campbell* and *Shutts* together, this Court now holds that a State has a legitimate interest in imposing damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction where the State has a significant contact or significant aggregation of contacts to the plaintiffs' claims which arise from the unlawful out-of-state conduct. We now apply this rule to the instant facts.

■ First, we note that the facts in *Shutts* are quite different from those below. In

*Shutts*, Kansas law was applied to all of the claims despite the fact that the vast majority of those claims had no connection to Kansas. In contrast, Appellees were all West Virginia residents who were initially informed of the Pennsylvania scheme, and wrongly assured that it was legal by Appellant's agent who was a resident of West Virginia. Further, Appellees' economic losses occurred in West Virginia. Therefore, West Virginia has a significant contact with the claims asserted by Appellees. As a result, the fact that a portion of Appellant's misconduct occurred in Pennsylvania is legally insignificant. Certainly, a West Virginia court has an interest in protecting its citizens from tortious conduct and is not precluded from doing so simply because some of the tortious conduct occurred in another state.

Appellant emphasizes, however, that it is not complaining of the use of the Pennsylvania wrongdoing to harm Appellees but rather that Appellant was wrongly punished for subjecting non-West Virginians to this misconduct. In other words, says Appellant, evidence that Magliocca's illegal conduct in Pennsylvania formed a pattern of behavior necessarily implies that there were other victims of this conduct. However, no evidence was presented that any other West Virginia residents attended the Pennsylvania training center. Appellant asserts that one must conclude from this that Appellant was punished for illegal conduct perpetrated by Magliocca against non-West Virginia victims. We reject this line of reasoning. The fact is that in this case, unlike *Campbell*, there was no evidence presented regarding specific unlawful acts against others perpetrated by Appellant. Rather, the evidence consisted merely of a generalized statement made by an agent of Appellant to the Appellees indicating that Appellant's licensing scheme was a regular operating practice. In light of this, it is obvious to this Court that Appellant was punished for its conduct toward Appellees and not for unlawful conduct against any other persons.

In addition, in regards to the matter of fairness to Appellant, when Appellant, through its agent Magliocca, involved Appellees in an illegal scheme to obtain a commer-

cial driver's license, it knew that Appellees were West Virginia residents whose initial contact with Appellant was through Goffoli, its agent in West Virginia. As a result, the fact that Appellant may be held accountable in West Virginia for its wrongful conduct which injured West Virginia citizens and which occurred in both West Virginia and Pennsylvania should not have been beyond Appellant's expectations.

Finally, we believe application of *Campbell* to the facts of this case as urged by Appellant would produce absurd results which certainly could not have been intended by the *Campbell* Court. As noted by Appellees, if Appellant's arguments concerning out-of-state conduct were accepted, a defendant could always escape liability for illegal conduct against citizens of one state if part of the illegal conduct occurred in another state. For example, it appears that Appellant would have us conclude that in a bad faith insurance claim, filed in West Virginia, wherein a West Virginia resident alleges that his or her claim was wrongly denied, the defendant insurance company cannot be punished in a West Virginia court for its wrongful denial of the claim solely because the wrongful denial actually occurred at the insurance company's home office in another state as a result of a company policy that violates the other state's insurance law and that likely also injured non-West Virginia insurance consumers. We simply reject such an unreasonable reading of *Campbell.* Accordingly, for the reasons stated above, we conclude that, under the specific facts of this case, the introduction of Appellant's illegal Pennsylvania conduct in the West Virginia trial was not sufficiently arbitrary or unfair as to exceed constitutional limits.

### 2. Amount of Punitive Damages Award

Next, Appellant challenges the total punitive damages award on the ground it is excessive under *BMW of North America v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In making this argument, Appellant avers that the excessiveness inquiry must omit the Appellant's out-of-state conduct. For the reasons provided above, we reject this argument and will proceed to determine whether the punitive dam-

ages award is excessive in light of Appellant's wrongful conduct in both West Virginia and Pennsylvania.

In Syllabus Point 6, in part, of *Alkire v. First Nat. Bank of Parsons,* 197 W.Va. 122, 475 S.E.2d 122 (1996), this Court held, in part:

Every post-trial analysis as to the amount of the punitive damage award should be conducted by the trial court exclusively within the boundaries of Syllabus Points 3 and 4 of *Garnes v. Fleming Landfill, Inc.,* 186 W.Va. 656, 413 S.E.2d 897 (1991), and Syllabus Point 15 of *TXO Production Corp. v. Alliance Resources Corp.,* 187 W.Va. 457, 419 S.E.2d 870 (1992).

Further, in Syllabus Point 5 of *Garnes, supra,* we explained that,

Upon petition, this Court will review all punitive damages awards. In our review of the petition, we will consider the same factors that we require the jury and trial judge to consider, and all petitions must address each and every factor set forth in Syllabus Points 3 and 4 of this case with particularity, summarizing the evidence presented to the jury on the subject or to the trial court at the post-judgment review stage. Assignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law.

According to Syllabus Point 3 and Syllabus Point 4, in part, of *Garnes,*

3. When the trial court instructs the jury on punitive damages, the court should, at a minimum, carefully explain the factors to be considered in awarding punitive damages. These factors are as follows:

(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater.

(2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.

(3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant.

(4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.

(5) The financial position of the defendant is relevant.

4. When the trial court reviews an award of punitive damages, the court should, at a minimum, consider the factors given to the jury as well as the following additional factors:

(1) The costs of the litigation;

(2) Any criminal sanctions imposed on the defendant for his conduct;

(3) Any other civil actions against the same defendant, based on the same conduct; and

(4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff.

Finally, according to Syllabus Point 15 of *TXO, supra,*

The outer limit of the ratio of punitive damages to compensatory damages in cases in which the defendant has acted with extreme negligence or wanton disregard but with no actual intention to cause harm and in which compensatory damages are neither negligible nor very large is roughly 5 to 1. However, when the defendant has acted with actual evil intention, much higher ratios are not *per se* unconstitutional.

In its brief to this Court, Appellant argues that the punitive damages award herein is improper under the three "guideposts" delineated by the Supreme Court in *Gore* which are the degree of reprehensibility, the ratio of the punitive damage award to the actual harm inflicted on the plaintiff, and the comparison of the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct. The reprehensibility guideposts were recently summarized by the Supreme Court in *Campbell* as follows:

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore, supra,* at 575, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809. We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. 517 U.S., at 576–577, 116 S.Ct. 1589, 134 L.Ed.2d 809. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of

further sanctions to achieve punishment or deterrence. *Id.*, at 575, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809.

*Campbell*, 538 U.S. at 419, 123 S.Ct. at 1521.

In regards to the *Gore* guideposts, Appellant first asserts that the circuit court failed to properly analyze Appellant's conduct under the reprehensibility guidepost. Specifically, avers Appellant, the circuit court focused solely on the out-of-state scheme to violate Pennsylvania law, and failed to consider that the harm caused to Appellees was economic rather than physical; Appellant's conduct was not specifically designed to harm Appellees; there was no evidence of repeated West Virginia conduct; and Appellant's conduct did not indicate indifference or a reckless disregard of the health and safety of others.

We find no merit to this argument. First, for the reasons stated above, we conclude that the circuit court did not err in considering Appellant's out-of-state conduct in its reprehensibility analysis. Also, although the circuit court's order does not specifically address the *Gore* guideposts, it does address the factors set forth in Syllabus Point 3 of *Garnes*. This Court has explained that the *Gore* guideposts "are merely reiterations of factors previously-adopted by both this Court and the United States Supreme Court[,][and] ... does not depart from existing law regarding punitive damages." *Vandevender v. Sheetz*, 200 W.Va. 591, 605, 490 S.E.2d 678, 692 (1997). We concluded in *Vandevender* that "there is simply no basis for ... [the] suggestion that [*Gore* ] demands that punitive damages awards be reviewed differently from the fashion in which they are currently being reviewed under *Garnes* and its progeny." 200 W.Va. at 606, 490 S.E.2d at 693.

 The circuit court found in its reprehensibility analysis under Syllabus Point 3 of *Garnes* that "[t]he Defendant's actions were illegal and illegal conduct is reprehensible. The Defendant was aware of proper licensing procedures but disregarded that procedure to circumvent the law for economic gain. The unrefuted testimony was that this process was used 'all the time' until Plaintiffs were nearly arrested[.]" We do not believe that the circuit court's finding of reprehensibility is in error. Further, considering the factors mentioned by the Supreme Court in *Gore*, the targets of Appellant's fraudulent conduct were financially vulnerable in that three of the four Appellees quit decent jobs [7] to become commercial truck drivers based on Appellant's representations. Also, because the jury found that Appellant committed fraud, the harm suffered by Appellees was the result of intentional conduct and not mere negligence. Finally, Appellant's scheme to illegally obtain commercial driver's licenses for Appellees was not an isolated incident but rather repeated conduct.

 Second, Appellant avers that the ratio of actual or potential harm suffered by Appellees and the punitive damage award is excessively disparate. Appellant explains that although the ratio of the $1 million in punitive damages to the $300,000.00 in compensatory damages, which is 3.3:1, does not appear on its face to be constitutionally infirm, the fact is that the compensatory award is made up in large part of a component that is duplicative of the punitive damages award and must therefore receive heightened scrutiny. As noted by Appellant, the stipulated economic losses of Appellees Brown, Boyd, Fadse, and Spear were $1,000.00, $14,000.00, $30,054.00, and $46,938.00 respectively which amounts to a total of $118,992.00 in stipulated economic losses. When this amount is subtracted from the total of $300,000.00 in compensatory awards, one is left with the sum of $208,008.00 as the non-economic component of the total compensatory award. Appellant

---

7. For example, Appellees Fadse, Boyd, and Spear testified that they were all employed at the same place prior to quitting in order to become truck drivers. Fadse testified that he had been employed there for almost 18 years; he made $23,000.00 a year; was a member of the union; and had benefits and a pension plan. He further testified that Goffoli told him that he should make between $28,000.00 and $32,000.00 his first year as a truck driver. Appellee Boyd testified that in his former job he was a member of the union; made $12.09 an hour; and had a pension plan. Finally, Spear testified that he made around $12.00 an hour. According to Fadse's testimony, when he attempted to be re-hired at his former place of employment, he was told that it had recently laid off 18 people, and it was not currently hiring.

concludes that when one reasonably assumes that the non-economic component of the compensatory award contains, in whole or in part, elements of punitive damages, and the punitive damages award is then compared to Appellees' economic damages, the ratio is 8.4:1, which, asserts Appellant, is unconstitutional. In support of its reasoning on this issue, Appellant points to language in *Campbell* where the plaintiff suffered only minor economic injuries, yet the jury awarded $1 million in compensatory damages. According to the Supreme Court in *Campbell*,

> [t]he compensatory damages for the injury suffered here, moreover, likely were based on a component which was duplicated in the punitive award. Much of the distress was caused by the outrage and humiliation the Campbells suffered at the actions of [State Farm]; and it is a major role of punitive damages to condemn such conduct. Compensatory damages, however, already contain this punitive element. See Restatement (Second) of Torts § 908, Comment *c*, p. 466 (1977) ("In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specific amount frequently includes elements of both").

538 U.S. at 426, 123 S.Ct. at 1525.

█ In addressing this issue in its order upholding the punitive damages award, the circuit court found as follows:

> The Defendant argues that the compensatory damages awarded to the Plaintiffs over and above the evidence of their economic loss should be construed to be "emotional distress" damages. Defendant further argues that West Virginia law does not permit an award of punitive damages if emotional distress damages are awarded. The final charge to the jury did not mention emotional distress. There was substantial uncontradicted evidence from all Plaintiffs that they experienced annoyance, aggravation and inconvenience as a result of their recruitment by Defendant's employee Goffoli and all that followed. West

> Virginia law does not support Defendant's contention that punitive damages cannot be awarded if damages for emotional distress, annoyance, aggravation or inconvenience are also awarded. *Tudor v. Charleston Area Medical Center*, 203 W.Va. 111, 506 S.E.2d 554 (1997); *Vandevender v. Sheetz, Inc.*, 200 W.Va. 591, 490 S.E.2d 678 (1997). The Supreme Court specifically limited *Tudor* and held in *Sheetz v. Bowles, Rice, McDavid, Graff & Love*, 209 W.Va. 318, 547 S.E.2d 256 (W.Va.2001), that only when the torts of the intentional or reckless infliction of emotional distress are involved will damages for emotional distress and punitive damages be considered double recovery. In view of the specific rejection by the Supreme Court of the Defendant's argument in this case and the fact that this was a fraud case, it cannot be said that the Plaintiffs received a double recovery.

We agree with the circuit court's analysis and its characterization of this Court's holding in *Sheetz*. We explained in *Sheetz* "that in the case of an intentional or reckless infliction of emotional distress claim, if there is not substantial and concrete evidence of a plaintiff's physical, emotional or psychiatric injury, some or all of an emotional distress damages award may actually be punitive damages." 209 W.Va. 318, 337, 547 S.E.2d 256, 275. We further said, however, that such a concern does not arise in a case in which the emotional distress and punitive damages award were based on claims of termination and retaliation in violation of our human rights and workers' compensation statutes. Therefore, in the instant case, the circuit court properly found that, because the instant case does not involve claims for intentional or reckless infliction of emotional distress, there is no reason to conclude that the punitive damages award is duplicative of the compensatory damages award.

█ In addition, even if we were to consider a portion of the compensatory damages in this case to be punitive damages so as to result in a ratio of 8.4:1, such a ratio is by no means necessarily unconstitutional. As the Supreme Court noted in *Campbell*, while single-digit multipliers (meaning a ratio of up to

9 to 1) are more likely to comport with due process "there are no rigid benchmarks that a punitive damages award may not surpass[.]" 538 U.S. at 425, 123 S.Ct. at 1524. In sum, there is nothing in our jurisprudence or that of the United States Supreme Court that renders the ratio of the punitive damages award to the compensatory damages award in this case improper.

■■■ Appellant's final argument on the issue of the punitive damages award is that the award is excessive under the third *Gore* guidepost which focuses on the difference between the punitive damages award and the civil penalties imposed in comparable cases. Specifically, Appellant explains that Appellees each paid Magliocca a $495.00 consulting fee. Appellant further asserts that the maximum penalty under West Virginia law for fraud or conspiracy to commit fraud involving money, goods or other property valued at less than $1,000.00 is $2,500.00, *citing* W.Va. Code § 61–3–24(a)(3) (1994), a sum that is dwarfed by the $250,000.00 punitive damage award for each Appellee. Again, we disagree.

In *Campbell, supra*, the Supreme Court compared the $145 million punitive damages award with "the most relevant civil sanction under Utah state law which was a $10,000.00 fine for an act of fraud" and found the disparity to be too great. However, the Court subsequently found that "[a]n application of the *Gore* guideposts to the facts of this case, especially in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive damages award at or near the amount of compensatory damages" which was $1 million. 538 U.S. at 429, 123 S.Ct. at 1526. Apparent from this statement is the fact that the Supreme Court did not believe that a punitive damages award one hundred times greater than the civil penalty that could be imposed for such conduct was excessive. Likewise, in the instant case, we do not believe that the third *Gore* guidepost compels the conclusion that the punitive damages award herein is excessive.

In sum, we conclude, for the foregoing reasons, that the punitive damages award below does not constitute an impermissible punishment of Appellant for out-of-state conduct in violation of *Campbell* and *Shutts*. Also, we find that the punitive damages award is not excessive under this Court's holding in *Garnes* and the United States Supreme Court case of *BMW v. Gore*.

### 3. Propriety of Magliocca's Settlement with Appellees

In its second assignment of error, Appellant seeks a new trial on the basis that Appellees' $4,000.00 settlement with Magliocca on the eve of trial after rejecting the previous settlement offer of $52,500.00 by Appellant and Magliocca was not made in good faith and it substantially impaired Appellant's ability to receive a fair trial.

■■■ First, we note that, upon learning of Magliocca's settlement with Appellees, Appellant sought a continuance of the trial, and the circuit court denied its request. This Court has held,

> The granting of a continuance is a matter within the sound discretion of the trial court, although subject to review, and the refusal thereof is not ground for reversal unless it is made to appear that the court abused its discretion, and that its refusal has worked injury and prejudice to the rights of the party in whose behalf the motion was made.

Syllabus Point 1, *State v. Jones*, 84 W.Va. 85, 99 S.E. 271 (1919). In its letter to the circuit court in which it requested a continuance, Appellant stated, "In light of this last minute settlement it will be extremely difficult if not impossible for Falcon to subpoena the presence of Mr. Magliocca and/or Ms. Gaglianni [Magliocca's employee]." The circuit court explained its reason for denying the continuance as follows:

> Falcon was not prejudiced by the absence of Co–Defendant Magliocca. Though John Magliocca resided outside the State of West Virginia, all parties had the opportunity to preserve his testimony at his deposition. Defendant Falcon Transport Company chose not to cross-examine John Magliocca. It was Defense Counsel's responsibility to preserve testimony through a deposition should it be necessary to use that deposition at trial

because the person is outside of the Court's jurisdiction. Having failed to cross-examine John Magliocca at the deposition to preserve his testimony and having failed to anticipate the possibility that John Magliocca may or may not appear at trial and having failed to anticipate that a settlement could occur between the Plaintiffs and John Magliocca, the Defendant, Falcon Transport Company, waived its right to claim that John Magliocca's absence at trial was in error.

The circuit court also found that Appellant advised the court prior to trial that it would not pursue its cross-claim against Magliocca and declined the court's offer to hold a hearing on that settlement.

 This Court's review of the record below reveals that a transcript of the deposition testimony of Ms. Gaglianni, who was an employee of Magliocca, was available at trial and was read by counsel for the Appellees. Also, portions of Magliocca's deposition testimony was read by counsel for both Appellees and Appellant. Further, as noted by the circuit court, Appellant had the opportunity to preserve Magliocca's testimony at deposition but chose not to cross-examine Magliocca. Therefore, Appellant cannot later complain of Magliocca's unavailability. In addition, it appears that Appellant has waived its alleged error of denying a continuance by declining the circuit court's offer to hold a hearing on the settlement. Finally, according to Rule 7(b) of the West Virginia Rules of Civil Procedure, when a party applies to the court for an order, he or she shall "state with particularity the grounds therefor." Appellant's request for a continuance however, was supported solely by a blanket assertion that it will be extremely difficult if not impossible to compel the presence of Magliocca and Ms. Gaglianni at trial which is insufficient under Rule 7(b). Accordingly, we find that the circuit court did not abuse its discretion in denying Appellant's request for a continuance.

 On appeal to this Court, Appellant specifically argues that it should be granted a new trial because the settlement between Magliocca and Appellees was designed by Appellees to prejudice Appellant at trial.

We note as a preliminary matter that the standard applied when reviewing a lower court's denial of a new trial is set forth in *Tennant v. Marion Health Care Foundation, Inc.*, 194 W.Va. 97, 104, 459 S.E.2d 374, 381 (1995), wherein we stated that we review the rulings of the circuit court under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Essentially, Appellant avers that the amount and timing of Magliocca's settlement indicates a corrupt intent to deprive Appellant of a fair trial. Further, Appellant says that it was deprived of a fair trial because most, if not all of the tortious conduct was committed by Magliocca. If Magliocca had been required to testify at trial, explains Appellant, the jury would have had the opportunity to weigh his conduct and demeanor against that of Appellant's witnesses. However, by settling on the eve of trial, with no notice to Appellant, Appellees assured themselves that Magliocca, an out-of-state resident, would not be present at trial.

 Appellant bears a heavy burden in seeking to prove that the settlement between Magliocca and Appellees was not made in good faith.

Settlements are presumptively made in good faith. A defendant seeking to establish that a settlement made by a plaintiff and a joint tortfeasor lacks good faith has the burden of doing so by clear and convincing evidence. Because the primary consideration is whether the settlement arrangement substantially impairs the ability of remaining defendants to receive a fair trial, a settlement lacks good faith only upon a showing of corrupt intent by the settling plaintiff and joint tortfeasor, in that the settlement involved collusion, dishonesty, fraud or other tortious conduct.

Syllabus Point 5, *Smith v. Monongahela Power Co.*, 189 W.Va. 237, 429 S.E.2d 643 (1993). In addition,

The determination of whether a settlement has been made in good faith rests in the sound discretion of the trial court. The focus of the trial court's determination

is not whether the settlement fell within a "reasonable range" of the settling tortfeasor's proportional share of comparative liability, but whether the circumstances indicate that the non-settling tortfeasor was substantially deprived of a fair trial because of corrupt behavior on the part of the plaintiff and the settling tortfeasor or tortfeasors. The determination of the trial court may be based on such evidence as it deems appropriate in the circumstances. In many (if not most) cases, a review of discovery documents and affidavits from counsel will be sufficient. The trial court may, in its discretion, conduct a hearing on the issue, but it is not required to do so. Syllabus Point 7, *Smith.*

We find that Appellant has failed to show by clear and convincing evidence that the settlement between Magliocca and Appellees lacked good faith. The offer of settlement made jointly by Appellant and Magliocca was $52,500.00 with Appellant to pay $47,500.00 and Magliocca to pay $5,000.00. Thus, the sum originally offered by Magliocca was close to the amount for which Magliocca ultimately settled. Also, Appellees explain in their brief that they were aware that Magliocca had little to offer in that he had no insurance and very limited financial resources. Further, we are unable to conclude that Magliocca's settlement with Appellees substantially impaired Appellant's ability to receive a fair trial. As noted above, both Appellees and Appellants read from the transcript of Magliocca's deposition. Therefore, we conclude that the circuit court did not abuse its discretion in denying Appellant's motion for a new trial based on Magliocca's settlement with Appellees.

### 4. Appellees Cross–Appeal—Denial of Attorney Fees and Costs

█ On cross-appeal, Appellees challenge the circuit court's denial of their request for attorney fees and costs. Specifically, Appellees asked for attorney fees of $45,562.50 and costs of $3,621.13. The circuit court denied Appellees' request due to the relatively high punitive damages award.

█ "As a general rule each litigant bears his or her own attorney's fees absent a

contrary rule of court or express statutory or contractual authority for reimbursement." Syllabus Point 2, *Sally–Mike Properties v. Yokum,* 179 W.Va. 48, 365 S.E.2d 246 (1986). One exception to this general rule is cases involving fraud. In Syllabus Point 4 of *Bowling v. Ansted Chrysler–Plymouth–Dodge,* 188 W.Va. 468, 425 S.E.2d 144 (1992), we held "[w]here it can be shown by clear and convincing evidence that a defendant has engaged in fraudulent conduct which has injured a plaintiff, recovery of reasonable attorney's fees may be obtained in addition to the damages sustained as a result of the fraudulent conduct." This Court stated in *Beto v. Stewart,* 213 W.Va. 355, 359, 582 S.E.2d 802, 806 (2003), that "[t]he decision to award or not to award attorney's fees rests in the sound discretion of the circuit court, and the exercise of that discretion will not be disturbed on appeal except in cases of abuse."

After review of the facts below, we are unable to find that the circuit court abused its discretion in denying an award of attorney fees and costs to Appellees. An obvious purpose of awarding attorney fees and costs in a case involving fraud is that intentional conduct such as fraud should be punished and discouraged. As reasoned by the circuit court, however, Appellant has been sufficiently discouraged from future fraudulent conduct by the sizable punitive damages awarded by the jury. As a result, an award of attorney fees and costs is not necessary to perform this function. We agree. Therefore, we find that the circuit court did not abuse its discretion in denying an award of attorney fees and costs to Appellees. Accordingly, we affirm the April 10, 2003, order of the circuit court that denied Appellees' request for attorney fees and costs.

### III.

### CONCLUSION

For the reasons set forth above, we affirm the March 28, 2003, order of the Circuit Court of Brooke County that denied Appellant's motion for remittitur of the jury award or, in the alternative, a new trial. We also affirm the April 10, 2003, order of the Circuit

Court of Brooke County that denied Appellees' request for attorney fees and costs.

Affirmed.

Justice DAVIS concurs and reserves the right to file a concurring opinion.

Justice STARCHER concurs and reserves the right to file a concurring opinion.

DAVIS, J., concurring.

In this well written decision the majority opinion has affirmed a punitive damage award. I concur in the conclusion reached on this issue. I have chosen to write separately to underscore what I perceive to be limitations on the reach of the majority decision as it concerns punitive damages and evidence of unlawful out-of-state conduct by a defendant.

### *Campbell* Revisited

The defendant in the instant case argued that the decision in *State Farm Mutual Insurance v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), was violated because the trial court allowed the introduction of evidence of unlawful out-of-state conduct by the defendant against nonlitigants. The majority opinion rejected this argument after finding that "in this case, unlike *Campbell*, there was no evidence presented regarding specific unlawful acts against others perpetrated by Appellant." Majority slip op. at 13.[1] Because the jury was never presented with evidence of specific unlawful conduct committed by the defendant against nonlitigants, the majority correctly found that *Campbell* was not violated.

### 1. Application of *Campbell* to out-of-state conduct against nonlitigants.

The decision in *Campbell* involved a first-party bad faith action brought against an insurer in the state of Utah. During the

course of the trial, the plaintiff sought to establish that the insurer had a nationwide policy of engaging in bad faith conduct in settling claims. To prove their theory, the plaintiff introduced evidence of "all types" of lawful out-of-state conduct that was committed by the insurer. The jury eventually returned a verdict awarding the plaintiff $1 million in compensatory damages and $145 million in punitive damages. The Utah Supreme Court affirmed the judgment. Subsequently, the United States Supreme Court granted certiorari. One of the issues addressed by the Supreme Court involved the use of an insurer's "lawful" out-of-state conduct against *persons other than the plaintiff* for the purpose of assessing punitive damages.

The Supreme Court made two dispositive rulings on the issue of out-of-state conduct perpetrated against nonlitigants as it relates to punitive damages. First, *Campbell* held that,

A State cannot punish a defendant for conduct that may have been lawful where it occurred. Nor, as a general rule, does a State have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction.

538 U.S. at 421, 123 S.Ct. at 1522, 155 L.Ed.2d at 603 (citations omitted). Second, the decision carved out an exception to the general rule regarding the use of evidence of a defendant's "lawful" out-of-state conduct against nonlitigants:

Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff. A jury must be instructed, furthermore, that it may not use evidence of out-of-state

---

1. To be clear, the sole evidence concerning other out-of-state illegal conduct by the defendant was presented in the context of a statement made to the plaintiffs by Mr. Goffoli that the proposed licensing scheme was something the defendants did "all the time." This evidence was admissible as a party admission notwithstanding *Campbell*. See *Board of Educ. of McDowell County v. Zando, Martin & Milstead, Inc.*, 182 W.Va. 597, 614, 390

S.E.2d 796, 813 (1990) ("Both Rule 801(d)(2)(D) of the West Virginia Rules of Evidence and our prior law recognize that statements made by an agent or employee within the scope of his agency or employment and during the existence of the agency or employment relationship are not hearsay and are admissible against a principal or employer who is a party to the litigation.").

conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred.

*Campbell,* 538 U.S. at 422, 123 S.Ct. at 1522–1523, 155 L.Ed.2d at 604 (citation omitted).

On a previous occasion I have pointed out that "[s]ince the facts in *Campbell* involved only *lawful* out-of-state conduct [against non-litigants], the opinion did not expressly state that its exception applied to *unlawful* out-of-state conduct [against nonlitigants]." *Jackson v. State Farm Mut. Auto. Ins. Co.,* 215 W.Va. 634, 600 S.E.2d 346, 361 n. 3 (2004) (Davis, J., concurring) (emphasis in original). Accordingly, I believe that the question of whether or to what extent *unlawful* out-of-state conduct against non-litigants may be used remains unanswered by *Campbell.*

## 2. Application of *Campbell* to unlawful out-of-state conduct against nonlitigants.

The decision in *Campbell* made clear that, as a general matter, "a plaintiff cannot introduce evidence of ... unlawful out-of-state conduct by a defendant, *for the sole purpose* of punishing the defendant." *Jackson,* 600 S.E.2d at 361 (Davis, J., concurring) (emphasis in original). Insofar as *Campbell* was concerned with "lawful" out-of-state conduct, it did not reach the question of whether an exception exists that would allow the introduction of evidence of "unlawful" out-of-state conduct against nonlitigants.

In the instant case, the defendant argued that the trial court allowed the introduction of evidence of unlawful out-of-state conduct by the defendant against nonlitigants. The defendant further contended that the introduction of such evidence violated *Campbell.* The majority opinion correctly found that the issue did not have to be reached, because plaintiffs did not introduce evidence of specific unlawful out-of-state conduct by the defendant against nonlitigants. Instead, the opinion correctly addressed the more narrow issue of unlawful out-of-state conduct committed against the plaintiffs.

*Campbell* clearly does not prohibit or impose limitations on the use of evidence that shows a defendant's tortious conduct against a litigant involved unlawful out-of-state conduct. Indeed, *Campbell* held that "[a] defendant should be punished for the conduct that harmed the plaintiff[.]" *Campbell,* 538 U.S. at 423, 123 S.Ct. at 1523, 155 L.Ed.2d at 604. Under *Campbell,*

> Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other [nonparties'] hypothetical claims against a defendant.... Punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains.

538 U.S. at 423, 123 S.Ct. at 1523, 155 L.Ed.2d at 604 (citation omitted).

In the final analysis, the new syllabus point created in the majority opinion stands for the sole proposition that West Virginia "has a legitimate interest in imposing damages to punish a defendant for unlawful acts committed outside th[e] State's jurisdiction where ... the plaintiffs' claims ... arise from the unlawful out-of-state conduct." Nothing in the new syllabus point or the majority opinion should be interpreted to mean that the Court has carved out an exception to *Campbell's* general prohibition on the use of evidence of unlawful out-of-state conduct by a defendant against nonlitigants. Whether or not an exception exists still remains to be decided.

In view of the foregoing, I concur.

STARCHER, J., concurring.

In this case, the defendants essentially contended that this Court should give an expansive reading to *State Farm Mut. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). The well-written majority opinion rightly opted to give *Campbell* a narrow interpretation in deciding to uphold the jury's punitive damage verdict.

I write separately to make clear that, when examined objectively, *Campbell* was not a significant decision by the U.S. Supreme Court. It did not dramatically alter the punitive damage landscape, and actually did little more than reiterate the standards of

review established in prior cases. As one court has noted:

> *State Farm [v. Campbell]* adds no new, free-standing factor to the constitutional analysis of punitive damages. . . . It is the court's view that *State Farm [v. Campbell]*, while bringing the *BMW [of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)]* guideposts into sharper focus, does not change the analysis. In fact, there are aspects of the due process evaluation of punitive damage awards which have not changed at all as a result of *State Farm [v. Campbell]*.

*In re the Exxon Valdez,* 296 F.Supp.2d 1071, 1076 (D.Alaska 2004).

### A.

#### *Out–of–State Conduct is Admissible Under* Campbell

The defendants in this case loosely argued that because the plaintiffs were injured by "out-of-state conduct," *Campbell* prevented the jury from awarding punitive damages. *Campbell* did no such thing.

The *Campbell* Court made clear that only two types of out-of-state conduct cannot be constitutionally considered by a judge or jury in making a punitive damage award. First, out-of-state conduct, even unlawful out-of-state conduct, that has no nexus to the conduct at issue in the case is inadmissible. Frankly, I am not sure why this rule rises to a constitutional level because such evidence should usually be excluded as irrelevant under our *Rules of Evidence,* but there it is. Second, the *Campbell* Court concluded that out-of-state conduct that is lawful where it occurs would generally not be admissible. However, the Court expressly stated that some lawful out-of-state conduct may still be considered:

> Lawful out-of-state conduct may be probative in a civil action when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff.

*Campbell,* 538 U.S. at 422, 123 S.Ct. 1513.

The unlawful conduct in the instant case—the defendant's actions in assisting and encouraging the plaintiffs to violate Pennsylvania law—clearly had a nexus to the plaintiffs' injuries. Further, the statement by Tom Goffoli to the plaintiffs that the out-of-state licensing scheme was something the defendants did "all the time" was probative evidence because it demonstrated the deliberateness and culpability of the defendants' actions. There is simply no procedural or constitutional prohibition that would prevent this evidence from being used to support a punitive damage award.

### B.

#### Campbell *Allows Punitive Damages to be Related to the Degree of Reprehensibility of the Defendant's Conduct*

As the majority opinion notes, the *Campbell* Court reiterated: "The most important indicium of reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." 538 U.S. at 418, 123 S.Ct. 1513 (*quoting BMW,* 517 U.S. at 575, 116 S.Ct. 1589).

The *Campbell* Court—relying upon its prior opinion in *BMW*—laid out five sub-factors for determining the degree of a defendant's reprehensibility: (1) whether "the harm caused was physical as opposed to economic"; (2) whether "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others"; (3) whether "the target of the conduct had financial vulnerability"; (4) whether "the conduct involved repeated actions or was an isolated incident"; and (5) whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.*

There is absolutely nothing in *Campbell* to suggest that all or most of these sub-factors must be present to support a punitive damage award. Instead, the threshold for supporting a punitive damage verdict seems to hover at, or just above, the presence of just one of the reprehensibility sub-factors. As the Court suggested, the "existence of any one of these [reprehensibility] factors . . . may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*

Furthermore, the Court has repeatedly recognized that when the defendant is a repeat offender, strong medicine is needed to get the defendant's attention regardless of the existence of any other factor delineated by the Court.

Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that *strong medicine* is required to cure the defendant's disrespect for the law. Our holdings that a recidivist may be punished more severely that a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance.

*BMW,* 517 U.S. at 576–77, 116 S.Ct. 1589 (citations omitted, emphasis added). *See also TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 462 n. 28, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).

In this case, the jury properly assessed the defendants' conduct, and their punitive damage verdict encompassed the reprehensibility of that conduct.

### C.

### Campbell *Did Not Limit Punitive Damages to a Single Digit Ratio*

The defendants in this case creatively interpreted the jury's $300,000.00 compensatory damage verdict as consisting of only $118,992.00 in "real" damages. The defendants then argued that the true ratio of compensatory damages to the $1,000,000.00 in punitive damages was not 3.3 to 1, but rather 8.4 to 1, a ratio the defendants asserted was unconstitutional under *Campbell.*

What the defendants overlooked in their argument is that nowhere in *Campbell* did the U.S. Supreme Court impose an exact mathematical formula for constitutionally permissible and impermissible punitive damages. There is no constitutionally-created

limit upon the ratio between compensatory and punitive damages. The *Campbell* Court explicitly reaffirmed that there is no "bright-line" rule, stating: "We decline again to impose a bright-line ratio which a punitive damages award cannot exceed." 538 U.S. at 425, 123 S.Ct. 1513.

Instead, the Court noted that "[o]ur jurisprudence" demonstrates that "in practice," "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* Thus, under *Campbell* only punitive damages in a "few" cases will permissibly exceed a single-digit ratio to compensatory damages "to a significant degree." Rather than rule that punitive damages can never exceed single digit ratios, the *Campbell* Court recognized just the opposite. While ratios closer to single digits are more likely to be constitutionally appropriate, there is nothing preventing a higher ratio when the circumstances warrant.

Nowhere does the Court discuss the constitutional basis or meaning of punitive damages that exceed a single digit ratio by "a significant degree," but the Court continues to stand by its prior opinions upholding ratios of punitive damages far in excess of single digits. For instance, in *TXO,* the U.S. Supreme Court affirmed a West Virginia jury's punitive damage verdict that was 526 times greater than the compensatory damages.[1] In a concurring opinion to *TXO,* Justice Kennedy—who later authored *Campbell*—stated unequivocally that the *TXO* award would still be permissible under the standards enunciated in *Campbell:*

The Constitution identifies no particular multiple of compensatory damages as an acceptable limit for punitive awards; it does not concern itself with dollar amounts, ratios, or the quirks of juries in specific jurisdictions ... I do not agree that [the punitive to compensatory ratio

---

1. In *TXO,* a West Virginia jury determined that the defendant TXO, a large oil company, intentionally sought to cloud the plaintiff's title to oil and gas rights which TXO desired to purchase. TXO's actions were found to be malicious and part of a broad practice of fraud. The jury awarded the plaintiff $19,000.00 in compensatory damages to clear the title to the oil and gas rights, and $10,000,000 in punitive damages. *See TXO Production Corp. v. Alliance Resources Corp.,* 187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).

relied upon by the majority] provides a constitutionally adequate foundation for concluding that the punitive damage verdict against TXO was rational.

*TXO*, 509 U.S. at 467–68, 113 S.Ct. 2711. Justice Kennedy went on to state that he found the award in *TXO* appropriate because of the evidence that the defendant had acted with malice as part of a "pattern and practice of fraud, trickery and deceit" and "unsavory and malicious practices." He also found the award supported by TXO's "vast financial resources," and the fact that "TXO would suffer only as a result of a large judgment." 509 U.S. at 469, 113 S.Ct. 2711.

The only conclusion to take away is that the defendants' argument in this case was balderdash. *Campbell* did not prescribe a mathematical, bright-line rule of ratios between punitive and compensatory damages. The jury in the instant case properly exercised its judgment and discretion, and related its punitive damage verdict to the reprehensibility of the defendants' conduct, and there was no constitutional requirement that they limit their assessment of the defendants' reprehensibility by some mathematical ratio.

I therefore respectfully concur with the majority's opinion.